## Case No. 7,437.

### JOLLIE v. JAQUES et al.

[1 Blatchf. 618;[1] 9 N. Y. Leg. Obs. 11; Cox, Manual Trade-Mark Cas. 57; 3 Am. Law J. (N. S.) 402.]

Circuit Court, S. D. New York. Oct. Term, 1850.

---

[1] [Reported by Samuel Blatchford, Esq., and here reprinted by permission.]

[James W. Gerard and Thomas C. T. Buckley, for defendants,

[Benjamin F. Butler and John C. Devereux, for complainant.

NELSON, Circuit Justice. This is a bill filed to restrain the defendants from an infringement of the plaintiff's copy-right in a musical composition known as "The Serious Family Polka, &c., arranged by George Loder." The author assigned his interest in the same to the plaintiff, who, on the 19th of February, 1850, deposited the title of the piece with the clerk of the district court for the Southern district of New-York, and on the next day the musical composition itself, in pursuance of the act of congress of the 3d of February, 1831 (4 Stat. 436), for the purpose of securing the copy-right.

1. The first section of that act provides, among other things, that any person, being a citizen of the United States, or resident therein, who shall be the author of any book or books, map, chart, or musical composition, and the legal assigns of such person, shall have the sole right and liberty of printing, publishing, and vending such book, &c., or musical composition, in whole or in part, for the term of twenty-eight years from the time of recording the title thereof. The fourth section prescribes, that no person shall be entitled to the benefit of the act, unless he shall, before publication, deposit a printed copy of the title of such book, &c., or musical composition, in the clerk's office of the district court of the district wherein the author or proprietor shall reside; and it is made the duty of the clerk to record the same in a book kept for that purpose; and the author or proprietor shall also, within three months from the publication, deliver or cause to be delivered a copy of said book, &c., or musical composition, to the clerk of said district; and it is also made the duty of the clerk, at least once in each year, to transmit a certified list of all such records, together with the several copies of books, musical compositions, &c., deposited, to the secretary of state, to be preserved in his office. The fifth section prescribes, that no person shall be entitled to the benefit of the act, unless he shall give information of the copy-right being secured, by causing to be inserted in each of the several copies published during the term secured, on the title page or the next page, if a book, or on the face, if a musical composition, the words: "Entered according to act of congress, &c., by A. B, in the clerk's office of the district court, &c."

It will be seen, therefore, by the provisions of this act, that there are three preliminary steps requisite to the securing of a valid copy-right: (1) The deposit of a printed copy of the title, before publication, with the clerk of the district court; (2) notice to the public, by printing, in the place designated, the fact of the entry, in the form prescribed by the statute; and (3) the deposit with the clerk of a copy of the book or musical composition within three months from the date of publication.

The tenth section of the act of congress passed August 10, 1846 (9 Stat. 106), establishing the Smithsonian Institution, provides that "the author or proprietor of any book,

map, chart, musical composition. &c., for which a copy-right shall be secured under the existing acts of congress, or those which shall hereafter be enacted respecting copy-rights, shall, within three months from the publication of said book, &c., deliver, or cause to be delivered, one copy of the same to the librarian of the Smithsonian Institution, and one copy to the librarian of congress library, for the use of the said libraries."

No penalty is declared in the act, as a consequence of the omission to comply with the provision; but it is insisted by the counsel for the defendants, that a construction should be given to the section, making the delivery of the copies a prerequisite to a title to the copy-right under the act of 1831, as otherwise the provision would be practically ineffectual to accomplish the object intended.

The law may be defective in this respect, for want of a penalty to enforce it; but we are unable to perceive how the construction contended for can be supported, upon any sound view of the section. It is found in an act establishing the Smithsonian Institution, and does not purport to be an amendment of the act of 1831 providing for the copy-right of authors. And besides, the duty is imposed upon the author or proprietor of any book or musical composition, "for which a copy-right shall be secured under the existing acts of congress, or those which shall hereafter be enacted;" thereby necessarily excluding any implication that it was intended to make the delivery to the respective libraries a condition to the vesting of the title to the copy-right. The duty is enjoined upon those who have already acquired the right, and upon those only, and no forfeiture is declared in case of a noncompliance. It would be a violent construction of the provision to annex this penalty by judicial interpretation. Every sound rule in the construction of statutes is against it. Courts lean against the enlargement of penal statutes beyond the fair and necessary import of their terms; much more will they lean against the creation of a forfeiture by implication, in the absence of any words indicating such intent.

In the case of Wheaton v. Peters, 8 Pet. [33 U. S.] 591, 663, 665, which arose under the acts of congress passed May 31, 1790 (1 Stat. 124), and April 29, 1802 (2 Stat. 171), it was decided by a divided court, that the publication of a copy of the record, as entered in the clerk's office of the district court, in the newspaper, within the two months, and the delivery of a copy of the book to the secretary of state within the six months prescribed by the third and fourth sections of the former act, were prerequisites to the title to the copy-right. But these acts were parts of the system, and steps required to be taken by the author or proprietor, to entitle himself to the exclusive right granted under it. And besides, the language of the first section of the act of 1802, which was supplementary to that of 1790, was regarded by a majority of the court as having, in terms, made the publication in the newspaper and the delivery to the secretary essential to the vesting of a complete title. But, even in that case, two of the learned judges dissented, maintaining that the title to the copy-right vested immediately on the deposit in the clerk's office of a copy of the title of the book, and the insertion upon the title page of the fact that an entry had been made according to the act of congress; that the subsequent steps prescribed by the statute were only declaratory; and that the omission of them did not work a forfeiture.

The question here is very different from the one decided in that case. The provision is found in a separate act—one relating to a different subject, and not referring to or purporting to be an amendment of the copy-right act of 1831, nor embracing within it any language indicating an intent to make the steps prescribed a condition of the title. The delivery of the book or musical composition is simply a duty enjoined upon the author or composer who has secured and is already in the enjoyment of his copy-right under existing acts of congress. The obligation to deliver does not attach till the right is secured.

It is very probable that congress designedly omitted to annex any penalty in case of neglect to furnish the librarians with the copies, intending that the provision should be declaratory only, leaving it optional with authors to deliver them or not. The expense in this case, and in many others, would be of no great importance; but in the case of elaborate and expensive works, and on the renewal of the copy-right of a series, after the expiration of the twenty-eight years, the tax would be heavy and exceedingly onerous. It would deserve grave consideration on the part of congress, if the question were before them, whether it would be expedient or just to impose this burthen upon authors.

As this question is one of considerable interest to authors and proprietors of works, the property in which depends upon a compliance with the requirements of the copy-right act, it is to be regretted that any provision of that act involving the title should be open to observation. Although we are quite clear that the view above taken is a sound one, and supported by the application of well settled rules of construction, yet it cannot be denied that some doubt must rest upon the question, until it is settled by paramount authority. In the meantime, it will doubtless be most prudent for authors to conform to the provisions of the act of 1846.

2. The bill of complaint charges, that one George Loder, a musical director in Burton's Theatre, prepared the music performed in

connection with and as part of the comedy called and known as "The Serious Family," particularly the music for the polka dance in said comedy; that he expended much labor, time, and musical knowledge and skill, in preparing and producing the same; that he took as the basis of said musical polka, a certain composition of a German musician published in Europe, but not republished in the United States until selected by the said Loder; that said Loder made a new application and use of said German music for the purposes of this comedy, and, with a view to a further publication, re-arranged the said composition, and, by improvements and additions, and new forms and combinations, adapted the same to the dance forming part of the comedy; that the said Loder also arranged the said musical polka, as performed at the theatre, for the piano-forte, for publication and for public and general use, and assigned his interest in the same to the plaintiff in this suit, who, on the 19th of February, 1850, took out a copy-right under the title already stated; that the music was in great demand, and the sales very profitable, until the piracies committed by the defendants, also set forth in the bill. The bill prays for an injunction and an account, &c.

The defendants, in opposition to the motion for an injunction, deny that they have published or are engaged in selling any polka which is similar in plan or matter to, or is a substantial copy of that published by the plaintiff, or that they have adopted, used, or embodied, in the one published by them, either the matter, arrangement, or additions of the musical composition contained in that of the plaintiff; that the polka called "The Serious Family Polka," published by them, was composed and written in a different key, and contains eight bars of original matter; that the only similarity consists in the melody, which, in both publications, was taken from a German composition, called "The Roschen Polka," which was well known and had been played by various bands in the city of New-York, and especially by a band known by the name of "Munck's Band," before the publication of the plaintiff; and that Loder had made no change in the melody of the Roschen Polka, nor had he added any new matter to the composition, or to the combination of the materials of the original air, but had simply adapted the old melody to the piano-forte.

It is further shown by an expert, who had examined and compared the two pieces of music, that the one published by the defendants is not only written in a different key, but that the first, third, fourth, fifth, seventh and sixteenth bars of the first part of the two editions, differ in the arrangement of the treble and bass notes of each bar; that in the second part, the first, third and fifth bars differ in the arrangement of the bass notes, the second, fourth and sixth bars in the arrangement of the treble notes, and the seventh bar in the arrangement of both treble

and bass notes; that the portion marked trio in the defendant's edition, containing eight bars, is different in all respects from the same part of the polka published by the plaintiff; that to the finale of the defendants' polka are added eight bars of original matter not found in any portion of the plaintiff's edition; that the music of his edition is, in the melody, taken substantially from the "Roschen Polka," the only difference being that the latter was arranged for the clarionet, and the former, by Loder, for the piano-forte; and that the adaptation to one instrument of the music composed for another, requires but an inferior degree of skill, and can be readily accomplished by any person practised in the transfer of music.

The act of congress of February 3, 1831, authorizes the grant of a copy-right to the author of a "musical composition," and the principal question in the case is, whether the adaptation of the music in the "Roschen Polka," already composed and in public use, to the "Serious Family Polka," is or is not a musical composition within the meaning of the statute. It is not claimed that Loder is the author of the melody or air; but simply that, by skill and labor, he has adapted it to a new use, or to a new instrument, the piano-forte for instance, instead of the clarionet.

Under the statute of 8 Anne, c. 19, in England, it was held that a musical composition was protected by a copy-right within the words "books or other writings;" and now, under the act of 5 & 6 Vict. c. 45, § 2, it is declared that in the construction of the act, the word "book" shall be construed to mean and include "every volume, part, or division of a volume, pamphlet, sheet of letter press, sheet of music, &c." Under these acts, it has been determined in effect, that the adaptation of a well known air, either by changing it to a dance, or by transferring it from one instrument to another, is not a work entitling an author to a copy-right. D'Almaine v. Boosey, 1 Younge, & C. Exch. 288.

The composition of a new air or melody is entitled to protection; and the appropriation of the whole or of any substantial part of it without the license of the author is a piracy. How far the appropriation might be carried in the arrangement and composition of a new piece of music, without an infringement, is a question that must be left to the facts in each particular case. If the new air be substantially the same as the old, it is no doubt a piracy; and the adaptation of it, either by changing it to a dance, or by transferring it from one instrument to another, if the ear detects the same air in the new arrangement, will not relieve it from the penalty; and the addition of variations makes no difference. The original air requires genius for its construction; but a mere mechanic in music, it is said, can make the adaptation or accompaniment.

The musical composition contemplated by

the statute must, doubtless, be substantially a new and original work; and not a copy of a piece already produced, with additions and variations, which a writer of music with experience and skill might readily make. Any other construction of the act would fail to afford the protection intended to the original piece from which the air is appropriated. The new arrangement and adaptation must not be allowed to incorporate such parts and portions of it as may seriously interfere with the right of the author; otherwise the copyright would be worthless. That portions may be taken and mixed up in the new arrangement and composition, cannot probably be denied; and there may be great difficulty in distinguishing between those new compositions that do, and those that do not absorb the merit of the original work. Each case must depend upon its own particular facts and circumstances. Persons of skill and experience in the art must be called in to assist in the determination of the question. It may often be a very nice one.

It is admitted in the bill in the case before us, that the basis of the arrangement in the "Serious Family Polka" was taken from a German musical composition; and it is further insisted by the defendants, that it is nothing more than a substantial copy of that piece, the whole of the air being the same, with slight and unimportant variations, which any person of ordinary skill and experience in music could have made.

The evidence on this part of the case is conflicting, and not sufficiently full to enable us to determine on which side the truth lies. We shall therefore suspend the decision on the motion for the injunction, and direct an issue at law upon the question; and that, in the meantime, the defendants keep an account of their sales, and report to the clerk monthly under oath.

3. It has been argued on the part of the plaintiff, that the name or title of his piece of music is original in the connection in which it is used, and that, conceding the musical composition itself not to be within the protection of the statute, still he is entitled to the injunction to restrain the defendants from the use of the same name in their publication.

It must be remembered that this is a suit founded upon the copy-right act, (see the act of February 15th, 1819, 3 Stat. 481, in connection with the act of February 3, 1831), and that in order to maintain it, the plaintiff must make out a title to sue, under his copy-right. Independently of this ground we have no jurisdiction of the case, as both parties are residents in, and, for aught that appears, citizens of New-York. The question, therefore, whether the court will interfere to prevent the use of the title in fraud of the plaintiff, upon principles relating to the good will of trades, is not before us, as it cannot be entertained in this suit. The act of 1831 grants a copy-right to the author of a "musical composition," provided he complies with the requisites therein prescribed, and, among others, deposits the title with the clerk of the court, who shall record it at length, and afterwards deposits a copy of the work within three months. The right secured is the property in the piece of music, the production of the mind and genius of the author, and not in the mere name given to the work. That is, indeed, essential, as well in taking out the copy-right, as in identifying the composition protected; and is sometimes, doubtless, the source of as much profit as the intrinsic merit of the work itself. But it is not the thing protected or intended to be protected. There need be no novelty or originality in it, nor need it even be the production of the author, for anything contained in the act; it may be taken from the suggestion of a friend, or picked up from any source, as the author may desire. The title or name is an appendage to the book or piece of music for which the copy-right is taken out, and if the latter fails to be protected, the title goes with it, as certainly as the principal carries with it the incident.

We do not say how the question might be decided in the case of a valid copy-right of the work, and an infringement of the title by the defendants. That would be a different question. It may be that the title should be considered as falling within the purview of the statute, and that to protect the work the court would be required to secure the title from piracy. But we express no opinion on this question. Our proposition assumes that the piece of music is not protected within the statute; and, if so, we think the name also is not. It must abide the result, in this respect, of the thing to which it is attached.