The judgment of conviction should be reversed and a new trial ordered.

HISCOCK, Ch. J., CARDOZO, POUND, McLAUGHLIN, CRANE and ANDREWS, JJ., concur.

Judgment of conviction reversed, etc.

---

JOHN G. UNDERHILL, Respondent, v. JOSEPH M. SCHENCK et al., Defendants, and RICHARD G. HERNDON, Appellant.

Contract — copyright — jurisdiction — where infringement of copyright is also a breach of a contract or abuse of a relation state courts have jurisdiction of action upon the breach or abuse — when licensee of play, with royalties measured by receipts, chargeable as trustee for unfair user thereof — sale by licensee of motion picture rights without consent of licensor — licensee bound to account for proceeds of sale to extent of percentage of gross receipts that would have been added to royalties — piracy of title not a separable wrong from piracy of play.

1. The author, who suffers infringement of his copyright at the hands of a licensee, may count upon the infringement as a tort, and seek redress under the statute by action in the federal courts. If the same act is not merely an invasion of the statutory right of property, but is also the breach of a contract or the abuse of a relation, he may count upon the breach or the abuse, and have relief in the state courts which, when this is the ground of action, are not shorn of their competence.

2. Upon examination of the pleading and proofs in the within action, held, that the suit is an attempt to hold a licensee to the obligation of fair dealing inherent in his contract and that the judgment against appellant is not subject to the criticism that it trenches upon the bounds of federal jurisdiction.

3. Appellant in accepting from plaintiff a license for the production in the United States and Canada of a certain play with royalties measured by receipts, became chargeable as a trustee, irrespective of the laws of copyright, if his user of motion pictures of said play,

produced without the consent of plaintiff, was an unfair diversion of the profits. (*Manners* v. *Morosco*, 252 U. S. 317, followed.)

4. Such a user is made out where it is shown that appellant sold, not merely his consent to the production of the play in moving pictures, but the world rights of reproduction which he represented to be his own and which he warranted to maintain if there was challenge of his title and, when he learned that plaintiff would not consent to the production, not only failed to tender back the price and ask rescission of the sale but encouraged the buyer to go on, recommending some slight changes in the mottoes on the pictures. In such circumstances he stands in a position similar to that of a contributing infringer and shares the guilt of the producer whom he has aided and abetted.

5. By becoming a party to a competing use which tended in its natural outcome to the reduction and diversion of the profits of the drama, appellant, as a quasi partner of plaintiff, was under a duty to deal with the competing business as an asset of the joint adventure and is bound to account to plaintiff for the proceeds of the sale as if collected under cover of the license and within the scope of its authority. The award, however, may not exceed the proportion of the receipts that would be payable if the wrong had not been done. For the percentages of the gross receipts that would thus be added to the royalties, the delinquent fiduciary must respond out of whatever has come into his hands through the betrayal of his trust.

6. An argument that though the play were of public right, reproduction by another under the same title would still be subject to restraint, even in the absence of a contract or a relation analogous to a trust, cannot be sustained. In the absence of contract or of some fiduciary relation or of some reasonable likelihood of deception or mistake, the piracy of the title is not a separable wrong from the piracy of the play; and the licensor when he forgoes his statutory copyright and the federal jurisdiction must fall back upon his contract and upon the attendant duty of good faith as the basis of his remedy in the tribunals of the state.

*Underhill* v. *Schenck*, 201 App. Div. 46, modified.

(Argued February 20, 1924; decided April 1, 1924.)

APPEAL from a final judgment, entered November 1, 1923, upon an order of the Appellate Division of the Supreme Court in the second judicial department, modifying and affirming as modified an interlocutory judgment in favor of plaintiff entered upon a decision of the court on trial at Special Term.

*David Vorhaus* and *Elijah N. Zoline* for appellant. Plaintiff in copyrighting his translation exhausted his common-law and statutory rights with respect to his literary composition. (*Palmer* v. *De Witt*, 47 N. Y. 532; *O'Neil* v. *General Film Company*, 171 App. Div. 854; *Harns* v. *Stern*, 229 Fed. Rep. 42; *Kidd* v. *Johnson*, 100 U. S. 617; *Donnelly* v. *Ivers*, 18 Fed. Rep. 592; *Jollie* v. *Jacques*, 1 Blatchf. 618; *Larson Co.* v. *Lamont* 257 Fed. Rep. 270; *Caliga* v. *Interocean Newspaper Co.*, 215 U. S. 182; *Wooster* v. *Crane*, 147 Fed. Rep. 515.) Plaintiff may not recover the profits which Herndon made on the sale of the picture rights to Schenck. (*Sharpless Co.* v. *Lawrence*, 213 Fed. Rep. 423; *Prest-O-Lite Co.* v. *Bournonville*, 260 Fed. Rep. 442; *Merriam Co.* v. *Saalfield*, 198 Fed. Rep. 369; *Newton* v. *Porter*, 69 N. Y. 133; *Silsbury* v. *McCoon*, 3 N. Y. 380.)

*John W. Hogan* and *Paul Bonynge* for respondent. The motion picture production under the title " The Passion Flower " competes with the spoken play of the same name to the disadvantage of the latter. (*Manners* v. *Morosco*, 252 U. S. 317; *Frohman* v. *Fitch*, 164 App. Div. 231; Frohlich on Law of Motion Pictures, 2; *Klaw* v. *General Film Co.*, 154 N. Y. Supp. 988; 171 App. Div. 945; *Manners* v. *Triangle Film Corp.*, 244 Fed. Rep. 293; *Dickey* v. *Mutual Film Corp.*, 160 N. Y. Supp. 609; *Harper Bros.* v. *Klaw*, 232 Fed. Rep. 609.) The fact that the plaintiff copyrighted his translation of the play does not oust the state courts of jurisdiction of an action to restrain an unauthorized use of the title " The Passion Flower." (*Fisher* v. *Star Co.*, 231 N. Y. 414; *Prest-O-Lite Co.* v. *Ray*, 220 N. Y. 522; *Waterman* v. *Shipman*, 130 N. Y. 301; *Outcault* v. *Lamar*, 135 App. Div. 110; *National Picture Theatres* v. *Foundation Film Corp.*, 266 Fed. Rep. 208; *Manners* v. *Triangle Film Corp.*, 244 Fed. Rep. 293; *Stern* v. *Laemmle Music Co.*, 74 Misc. Rep. 262; *Frohman* v. *Morris, Inc.*, 68 Misc.

[238 N. Y. 7] Opinion, per CARDOZO, J. [April,

Rep. 461; *Selig Polyscope Co.* v. *Unicorn Service Corp.,* 163 N. Y. Supp. 62; *Frohman* v. *Payton,* 34 Misc. Rep. 275.) The plaintiff is entitled to recover the profits of the defendants Schenck and Herndon. (*Westcott Chuck Co.* v. *Oneida N. Chuck Co.,* 199 N. Y. 247; *Cutter* v. *Gudebrod Brothers Co.,* 190 N. Y. 252; Nims on Unfair Competition [2d ed.], § 421; *Singer Mfg. Co.* v. *June Mfg. Co.,* 163 U. S. 169; *Coupe* v. *Royer,* 155 U. S. 565.)

CARDOZO, J. Plaintiff bought from Jacinto Benavente, a Spanish playwright, in return for a promise of royalties, the right to translate the play " La Malquerida," and to produce it or cause it to be produced upon the English-speaking stage. The play when rendered into English was given a new name, the Passion Flower, which is not a translation of its title in the original. A contract followed between plaintiff, described as the proprietor, and the defendant Herndon, described as the manager. By this contract dated January 4, 1920, the proprietor conferred upon the manager the right to produce the translated play in the United States and Canada under the title of the Passion Flower with an option to acquire a like right in the kingdom of Great Britain and Ireland. The manager agreed to pay to the proprietor percentages of the gross receipts varying from a minimum of five per cent to a maximum of ten. There is an express provision " that no rights to the production of the play in motion pictures are conveyed by this agreement."

The play came out upon the stage, and was at once a great success. Translator and manager were anxious to extend the field of triumph and of profit. They turned in thought to motion pictures, but the difficulty was to know to whom the motion picture rights belonged. Motion pictures, if produced, would be in competition with the spoken play, and competition with the spoken play, though the translator were to allow it, might be

unfair to the author, Benavente. The situation was complicated by the fact that as early as 1913 Benavente had copyrighted in the United States the Spanish version of his drama. In this predicament, translator and manager made a provisional contract, conditioned upon Benavente's approval. They agreed, subject to that approval, to hold the motion picture rights for joint account, the profits of the enterprise to be subject to a prescribed division. This agreement proved abortive, for Benavente's consent was not forthcoming. He had deprived himself of the ability to give any consent that would be effective, by conveying his own interest in the world motion picture rights to one Gonzalez. Plaintiff on learning this gave notice to Herndon that for failure of the condition precedent attached to its delivery, the contract would be canceled. Even before this notice Herndon had already sought out Gonzalez, and was treating with the new owner for an assignment to himself. He received such an assignment on June 5, 1920, simultaneously almost with notice of the failure of the contract; and without a word to the plaintiff, proceeded to deal with the assignment as his own. He found a purchaser of the rights in the defendant Schenck. The contract between them (dated October 13, 1920) is in writing, and its provisions are important. Herndon, described as the owner, " does give, grant, bargain, sell, assign, transfer and set over to the Purchaser, the full, free and unencumbered right, title and interest in and to the motion picture rights in the play of which Jacinto Benavente is the author, entitled La Malquerida, as well as in and to the English translation thereof made by John G. Underhill, entitled The Passion Flower, the titles and the theme thereof." The purchaser agrees to pay to the owner $25,000, the receipt of $15,000 being acknowledged, and the balance, $10,000, to be paid within thirty days. " The owner represents that he is the sole owner of the motion picture rights in and to the said

play throughout the entire world, and has full right and authority to grant the right herein contained," and also undertakes to indemnify the purchaser against the consequences of the violation or alleged violation of any copyright as the result of the use of the play in a motion picture version. Within sixty days he is to deliver to the purchaser the written consent of Underhill (the plaintiff) to the use of the title, the Passion Flower, and also declarations confirmatory of his ownership, to be signed by Benavente and Gonzalez. If these are not delivered, the purchaser is to have the privilege of terminating the contract and receiving back from the owner the payments made thereon.

Underhill would not consent. Schenck would not desist. He was spurred on by Herndon, who was bound by warranty of title whether Underhill approved or not. The pictures were produced upon the screen in April, 1921. At that time this action had already been begun against Herndon, Schenck and Benavente. There followed in June, 1921, an interlocutory judgment. The name or title the Passion Flower was adjudged to belong to the plaintiff to the exclusion of every one else; the right to translate into the English language the play La Malquerida and to produce it on the stage was adjudged to be his, and the reproduction of the play in motion pictures with lines, titles or captions in the English language was adjudged to be unlawful, unless with his consent; all the defendants were restrained from advertising or exhibiting a motion picture reproduction in violation of the plaintiff's rights as thus established and declared; the defendants Herndon and Schenck were adjudged to be liable, not only for all damages, but also for all profits made by them or either of them; and a referee was appointed " to take and state an account of said profits and of the plaintiff's damages in the premises." This interlocutory judgment was modified at the Appellate Division by narrowing to some extent the scope of the

injunction, and as so modified affirmed by a divided court. The accounting has now ended in a final judgment against Herndon and Schenck for the profits of the enterprise. Herndon has been held for $22,500 with interest from January 24, 1921, the full amount ($25,000) paid to him by Schenck, less broker's commissions of $2,500. Schenck has been held for $1,362.41 with interest from September 12, 1922, the net profits of the pictures after charging the $25,000 paid to Herndon as one of the expenses of production. The present appeal which comes to us under Civil Practice Act (§ 590), thus confining our review to the interlocutory judgment, is by Herndon alone.

A challenge to the jurisdiction of the state courts confronts us at the threshold. The right protected by the injunction is secured to the plaintiff, we are told, by the Copyright Act of Congress, if, indeed, it belongs to him at all, and it must be vindicated, if at all, by the judgment of the Federal courts (Judicial Code, § 256). The Appellate Division avoided this objection, or attempted to avoid it, by directing the injunction to the reproduction in the form of motion pictures, not simply of the copyrighted play, but of the copyrighted play with the uncopyrighted title. So subtle a distinction is an uncertain guide to judgment. We prefer, in upholding jurisdiction, to build upon a broader basis. The plaintiff does not rest his claim upon the infringement of any right of property secured to him by copyright in accordance with the act of Congress. One will read his complaint from the beginning to the end without finding an allegation that a copyright is his. The translation, for all that the complaint discloses, may remain unpublished in his desk. The fact of copyright and publication does indeed creep out in the course of the trial, but only incidentally and casually. What the plaintiff complains of in his controversy with Herndon is the breach of a duty attaching by implication of law to a fiduciary relation which has its origin in contract. Herndon is

his licensee under covenant to produce the play upon the stage, the receipts to be divided in designated proportions. This fiduciary relation charged the fiduciary with a duty to refrain from forms of competition involving unfair diversion of royalties or profits. The position of such a one is analogous in this respect to the position of a partner. What he gains from a competing business, if the competition is so close as to transcend the bounds of fairness, he is not to keep for himself, but is to surrender to the joint adventure (*Trimble* v. *Goldberg*, 1906, A. C. 494, 500; *Aas* v. *Benham*, 1891, 2 Ch. D. 244, 255; *Latta* v. *Kilbourn*, 150 U. S. 524, 549; *Beatty* v. *Guggenheim Exploration Co.*, 225 N. Y. 380, 386; cf. *Cescinsky* v. *Routledge & Sons, Ltd.*, 1916, 2 K. B. 325). This duty is quite apart from the duty of reparation that rests upon the infringer of a copyright. It would exist though no copyright law had ever been enacted. It has its origin, not in a right of property, but in a contract or relation. The author who suffers infringement of his copyright at the hands of a licensee, may count upon the infringement as a tort, and seek redress under the statute by action in the federal courts. But that is not in all circumstances the only remedy available. If the same act is not merely an invasion of the statutory right of property, but is also the breach of a contract or the abuse of a relation, he may count upon the breach or the abuse, and have relief accordingly. When this is the ground of action, the courts of the state are not shorn of their competence (*Henry* v. *Dick Co.*, 224 U. S. 1, 14, and cases cited; *Geneva Furniture Mfg. Co.* v. *Karpen*, 238 U. S. 254, 259; *Excelsior Wooden Pipe Co.* v. *Pacific Bridge Co.*, 185 U. S. 282; *Briggs* v. *U. S. M. Co.*, 239 U. S. 48, 49; *Wise* v. *Tube Bending Machine Co.*, 194 N. Y. 272; *Montgomery Palace Stock Car Co.* v. *Street Stable Car Line*, 43 Fed. Rep. 329; *St. Louis Street Flushing Machine Co.* v. *Sanitary Street F. M. Co.*, 161 Fed. Rep. 725; *Lefkowitz* v. *Foster H. S. Co.*, 161 Fed. Rep. 367). All

depends upon the nature of the right to be enforced or the wrong to be redressed.

We think the suit before us, whether tested by pleading or by proof, is an attempt to hold a licensee to the obligation of fair dealing inherent in his contract. In that view the judgment against Herndon is not subject to the criticism that it trenches upon the bounds of federal jurisdiction. Since Schenck does not appeal, there is no occasion to determine whether the same considerations apply equally to him. But the case is not disposed of. even against Herndon, when jurisdiction is established. Granting jurisdiction, we must consider the determination of the merits. The point of departure for one who embarks on that inquiry is the decision of the Supreme Court of the United States in *Manners* v. *Morosco* (252 U. S. 317). By that decision a licensee who has received from an author the right of dramatic reproduction is not at liberty to produce the same play in motion pictures without the consent of the author, the owner of the copyright. On the other hand, the author or owner who has licensed dramatic reproduction, is himself under a disability to produce the play in motion pictures, since in so doing he competes unfairly with the user by the licensee of rights acquired under the license. " There is implied a negative covenant on the part of the [grantor] not to use the ungranted portion of the copyright estate to the detriment, if not destruction, of the licensees' estate " (per HOUGH, J., in *Harper Bros.* v. *Klaw*, 232 Fed. Rep. 609, 613, quoted and adopted in *Manners* v. *Morosco*). Neither can move without the approval of the other. We cannot doubt that under *Manners* v. *Morosco*, and under the settled principles applicable to fiduciary relations, Herndon in accepting a license with royalties measured by receipts, became chargeable as a trustee, irrespective of the law of copyright, if his user of the pictures was an unfair diversion of the profits.

Whether such user has been made out is the question

next in order. The terms of the contract between Herndon and Schenck must be held clearly in mind before the question can be answered. Herndon undertook to sell, but he undertook at the same time to procure Underhill's consent. The significance to be ascribed to this undertaking will go far to determine the quality of the user. Herndon, as licensee, might be unable himself to produce the motion pictures, but he was none the less in a position to prevent others from producing them. His consent was necessary, in other words, even for one acting with Underhill's approval. If all that he did was to sell whatever rights he had, upon the condition or even in the belief that no use would be made of them till Underhill consented, the transaction would be free from blame. He would not then be aiding or abetting unlawful competition. But he was doing much more as his contract clearly shows. He sold, not merely his consent, but the world rights of reproduction which he represented to be his own, and which he warranted to maintain if there was challenge of his title. His covenant to supply the buyer with Underhill's consent in writing, like his covenant to supply confirmatory declarations from Benavente and Gonzalez, was one for further assurance. It did not qualify his warranty of title, nor condition his invitation to the buyer to go forward with production. If this would be doubtful on the face of the contract without more, the doubt would be dispelled by the later course of dealing. Herndon learned before many days that Underhill would not consent. With this knowledge he did not tender back the price and ask rescission of the sale. He encouraged Schenck to go on, recommending some slight changes in the mottoes on the pictures. In such circumstances, he stands in a position similar to that of a contributing infringer (*Kalem Co.* v. *Harper Bros.*, 222 U. S. 55, 58; *Wells* v. *Am. Bureau of Engineering*, 285 Fed. Rep. 371; *Am. Code Co.* v. *Bensinger*, 282 Fed. Rep. 829, 834; *Harms* v. *Cohen*, 279 Fed. Rep. 276, 278; *Rupp & Wittgen-*

*feld Co.* v. *Elliott,* 131 Fed. Rep. 730, 732; *Harper* v. *Shop-pell,* 28 Fed. Rep. 613). The controlling principle has support in a multitude of instances. One who sells a film with the intention that the buyer shall use it in the infringement of a copyrighted drama is himself liable as an infringer (*Kalem Co.* v. *Harper Bros., supra*). So also one who sells it with the intention that it shall be used in unfair or disloyal competition becomes himself, in that act, a participant in the competition that ensues. He shares the guilt of the producer whom he has aided and abetted.

The question remains whether the guilt of the aider and abettor entails accountability for profits, and, if so, to what extent. Damages whether resulting from infringement in the strict sense or from unfair competition can seldom be traced with even approximate precision (*Westcott Chuck Co.* v. *Oneida Nat. Chuck Co.,* 199 N. Y. 247, 251, 252). The courts have thus been led to award alternative relief by charging the wrongdoer with the duty to account for the profits of the enterprise (*Westcott Chuck Co.* v. *Oneida Nat. Chuck Co., supra*). Sometimes there is a typical constructive trust, as where the abuse of a fiduciary relation (*Beatty* v. *Guggenheim Exploration Co., supra*), or the misappropriation of another's property (*Newton* v. *Porter,* 69 N. Y. 133), has brought the profits into being. Sometimes liability to account is adjudged by analogy, as if there were a trust, though there is neither *res* misapplied nor confidence abused (*Westcott Chuck Co.* v. *Oneida Nat. Chuck Co., supra; Root* v. *Railway Co.,* 105 U. S. 189, 194, 214; *Tilghman* v. *Proctor,* 125 U. S. 136, 148; *Hamilton-Brown Shoe Co.* v. *Wolf Bros. & Co.,* 240 U. S. 251, 259, 262; *Martin Co.* v. *Martin & Wilckes Co.,* 75 N. J. Eq. 257, 260; Robinson, Patents, §§ 1137, 1086, 1091). Nice distinctions may then be necessary. In general, an account of profits presupposes some approximate relation of correspondence, a causal relation not wholly unsubstantial and imaginary, between the gains of the aggressor and those diverted from his victim (cf.

2

*Lawrence* v. *Hull,* 169 Mass. 250; *Regis* v. *Jaynes,* 191 Mass. 245; *Nelson* v. *Winchell & Co.,* 203 Mass. 75, 88, 90; *Clark Thread Co.* v. *Clark Co.,* 56 N. J. Eq. 789; *Prest-o-lite Co.* v. *Bournonville,* 260 Fed. Rep. 442; *N. Y. Bank Note Co.* v. *Hamilton Bank Note Engr. & P. Co.,* 180 N. Y. 280, 296). This relation existing, the burden of unraveling the tangle will at times rest upon the accountant, after the analogy of the confusion of goods (*Hamilton-Brown Shoe Co.* v. *Wolf Bros. & Co., supra; Belford* v. *Scribner,* 144 U. S. 488, 508; *Callaghan* v. *Myers,* 128 U. S. 617, 665; *Reading Stove Works* v. *Howes Co.,* 201 Mass. 437), and at times upon the suitor who calls him to account (*Hamilton-Brown Shoe Co.* v. *Wolf Bros. & Co., supra; Lawrence* v. *Hull, supra; N. Y. Bank Note Co.* v. *Hamilton Bank Note Engr. & P. Co., supra*). We are not required to probe more deeply into these subtleties for the decision of the case at hand. If Herndon is accountable at all, it is on the basis of a quasi-partner, under a duty to deal with the competing business as an asset of the joint adventure.

On that basis and to that extent an account should be decreed. Herndon became a party to a competing use which tended in its natural outcome to the reduction and diversion of the profits of the drama. True he was not the producer of the pictures, but only the seller of the picture rights. True also, the sale of these rights would have no effect as a competing use unless followed by production. Production did follow, however, and this at the seller's procurement and with his active co-operation. When this ensued, the sale and the production were successive stages of a single wrong. Aider or abettor became liable equally with producer to make equitable contribution to the business they had ravaged for the profits accruing to each through a share in the conspiracy. We think the proceeds of the sale must be accounted for as if collected by the licensee under cover of the license and within the scope of its authority.

The judgment under review imposes a standard of liability which outruns or may outrun the bounds of duty thus defined. It requires Herndon to account not only for " all the profits " that have come to him through the production of the pictures, but also " all " that have come " through the invasion of the plaintiff's rights." This was construed by the majority of the Appellate Division, against the protest of the minority, as imposing the duty to surrender to the plaintiff the net proceeds of the sale. Even if the words of the judgment, standing alone, may be thought to be ambiguous, we are not at liberty to disregard the gloss that has thus been placed upon them. The final judgment. which follows out this theory is in fairness to be regarded, not as an original adjudication, decreeing a new measure of liability, but as the declaration of a liability already preordained. We think an accountability so onerous is inconsistent with the maintenance of the action as one, not for infringement of a copyright, but for an abuse of trust resulting in a diversion of the profits. If the competing enterprise had never been initiated, and its entire receipts had been added to the receipts of the spoken drama, the plaintiff would have collected at the utmost ten per cent of the resulting increment. He can have no more to-day. Let us suppose, for illustration, that the production of the pictures had yielded $182,039.88 in the form of gross receipts, the sum stated in the final judgment. The addition of such a sum to the receipts of the spoken play would give the plaintiff five per cent of the first $4,000, seven and one-half per cent of the next $3,000, and ten per cent of the balance, a total of $17,929.98. Under the rulings of the courts below, the plaintiff would not be limited to a total so computed. He would be given the net proceeds of the. sale even though they might prove to be in excess of his percentages of gross receipts: Such a method of computation, unduly favorable to the plaintiff, ignores the rationale of the action. The wrong to be redressed is

not the misappropriation of his property. If that were his grievance, his remedy would be in the federal courts. The wrong to be redressed is the reduction of the profits of his business through the unfair competition of an associate who has turned out to be a rival. The award may not exceed the proportion of the receipts that would be payable if the wrong had not been done.

In thus holding, we do not ignore the distinction insisted upon by the plaintiff between misuse of the copyrighted play and that of the uncopyrighted title. The argument seems to be that though the play were *publici juris,* reproduction by another under the title of " The Passion Flower " would still be subject to restraint, and this in the absence of contract or of a relation analogous to a trust. We think the argument must fail. If a copyright does not exist, or, once existing, has been lost, the name is lost too, in so far as it is merely a symbol descriptive of the copyrighted thing (*Singer Mfg. Co.* v. *June Mfg. Co.,* 163 U. S. 169, 191, 193; *Herring-H.-M. Safe Co.* v. *Hall's Safe Co.,* 208 U. S. 554, 559; *Merriam* v. *Holloway Publ. Co.,* 43 Fed. Rep. 450; *Wheeler & Wilson Mfg. Co.* v. *Shakespear,* 39 L. J. Ch. 36). We are not to confuse such situations with others, which, superficially similar, are fundamentally distinct. A name which has become descriptive of one play may not be attached by a competitor to another, when the duplication will mislead the public into the belief that the two performances are alike (*National Picture Theatres* v. *Foundation Film Corp.,* 266 Fed. Rep. 208). So a name which is associated in common thought, not merely with the thing produced, but with the source or origin of production, may not be used, though the term of copyright or of patent has expired, without explanation adequate to guard against mistake (*Singer Mfg. Co.* v. *June Mfg. Co., supra; Donnell* v. *Herring-Hall-Marvin Safe Co.,* 208 U. S. 267, 274; *Herring Safe Co.* v. *Hall's Safe Co., supra; Saxlehner* v. *Wagner,* 216 U. S. 375, 381; cf. *Fisher* v. *Star Co.,* 231 N. Y. 414).

There is little analogy between such situations and the one before us here. No danger exists that the patrons of the moving pictures will be misled into the belief that they are to witness a performance of the spoken drama. Very likely they will understand that the plots will be the same, but in this they will understand correctly. They will not be tricked into the belief that they are about to see one thing when in truth they are to see another. In the absence of contract or of some fiduciary relation or of some reasonable likelihood of deception or mistake, the piracy of the title is not a separable wrong from the piracy of the play (cf. *Atlas Mfg. Co.* v. *Street*, 204 Fed. Rep. 398; *Glaser* v. *St. Elmo Co.*, 175 Fed. Rep. 276; *Harper* v. *Ranous*, 67 Fed. Rep. 904; *United Drug Co.* v. *Rectanus Co.*, 248 U. S. 90). " The title or name is an appendage to the book or piece of music for which the copyright is taken out, and if the latter fails to be protected, the title goes with it as certainly as the principal carries with it the incident " (*Jollie* v. *Jacques*, 1 Blatchf. 618).

We find, then, no support for a new principle of liability in the fact without more that there has been an appropriation of the name. The chance of deception or mistake being excluded (*Ogilvie* v. *Merriam Co.*, 149 Fed. Rep. 858; 159 id. 638; 170 id. 167), the licensor, when he foregoes his statutory copyright and the federal jurisdiction, must fall back upon his contract and upon the attendant duty of good faith as the basis of his remedy in the tribunals of the state. In narrowing his grievance, he narrows his recovery. If copyright be eliminated, Herndon was under a duty not to produce the pictures without Underhill's consent for the reason and solely for the reason that in so doing he was competing unfairly with the business covered by the license. Underhill was under a like duty not to compete to the detriment of Herndon (*Manners* v. *Morosco, supra*). The vice of competition is eradicated when the proceeds of the production of the pictures are consolidated with those of the production of

the play. For the percentages of the gross receipts that would thus be added to the royalties, the delinquent fiduciary must respond out of whatever has come into his hands through the betrayal of his trust.

The final judgment should be reversed, and the interlocutory judgment, as modified by the Appellate Division, should be further modified by striking out its provisions for an accounting by the defendant Herndon, and by substituting a provision that he account before a referee for so much of the profits resulting from a sale of the motion picture rights as may be equal to the sum that would be payable to the plaintiff if the receipts of the pictures were added to and formed a part of the receipts of the spoken play. As so modified, the interlocutory judgment should be affirmed, without costs to either party against the other.

HISCOCK, Ch. J., POUND, McLAUGHLIN, CRANE, ANDREWS and LEHMAN, JJ., concur.

Judgment accordingly.