## MANNERS *v.* MOROSCO.

### CERTIORARI TO THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

No. 370. Argued March 2, 1920.—Decided March 22, 1920.

Plaintiff, a dramatic author, granted defendant the "sole and exclusive license and liberty to produce, perform and represent" his copyrighted play in the United States and Canada, defendant agreeing to produce it "not later than January first, 1913, and to continue . . . for at least seventy-five performances during the season of 1913–1914 and for each theatrical season thereafter for a period of five years;" in default of 75 performances in any one theatrical year, all of defendant's rights were to revert to plaintiff; the play was to be presented in first-class theaters with competent companies and with a designated actress in the title rôle, a percentage of the gross receipts going to plaintiff as royalties; if it failed, it was to be let to stock companies, and the royalties thus accruing were to be divided equally between the parties; rehearsal and production were to be under the plaintiff's direction; no changes in the play were to be made without his approval, and he was to have the right to print and publish it, but not within six months of its first production without defendant's consent.

*Held:* (1) That the grant was not limited to five years' duration. P. 325.

(2) It did not convey the right to represent the play in motion pictures. *Id.*

(3) There was an implied covenant by the grantor not to use the reserved motion picture rights to the destruction of the rights granted. P. 326.

(4) Plaintiff is entitled to an injunction against representation in motion pictures, but upon condition that he also shall abstain from representing or authorizing representation in that form in Canada or the United States. *Id.*

258 Fed. Rep. 557, reversed.

THE case is stated in the opinion.

*Mr. David Gerber,* with whom *Mr. William J. Hughes* was on the briefs for petitioner:

The situation of the parties at the time the contract was entered into, and their acts in performance thereunder, are at war with the belated claim of respondent that he had the right to use the drama as the basis for a photoplay.

The contract is not a grant or assignment—but a license to produce the play in the United States and Canada, subject to "the terms, conditions and limitations" therein expressed, and every "term," "condition" or "limitation" is applicable only to a production of the play as a spoken drama, and inappropriate to the use of petitioner's literary work as the basis for a scenario for a photoplay or screen performance. *Heap* v. *Hartley*, 42 L. R. Ch. Div. 461; *London Printing & Publishing Alliance* v. *Cox*, 7 Times L. R. 738; *Neilson* v. *Horniman*, 26 Times L. R. 188; *Stevens* v. *Benning*, 1 Kay & J. 168; *Tuck* v. *Canton*, 51 L. J. (N. S.) pt. 2, pp. 363–365; *Lucas* v. *Cooke*, 13 L. R. Ch. Div. 872; *McIntosh* v. *Miner*, 37 App. Div. 483; *Harper Bros.* v. *Klaw*, 232 Fed. Rep. 609, 612; *Universal Film Mfg. Co.* v. *Copperman*, 218 Fed. Rep. 577–578; *Photo Drama Motion Picture Co.* v. *Social Uplift Film Corp.*, 213 Fed. Rep. 374–377; *New Fiction Publishing Co.* v. *Star Co.*, 220 Fed. Rep. 994–995; *London* v. *Biograph Co.*, 231 Fed. Rep. 696–697; *Klein* v. *Beach*, 239 Fed. Rep. 108, 110.

The modification of the contract, made July 20, 1914, somewhat reflects what was in the minds of the parties in January, 1912.

The word "represent" used in the contract, cannot be construed as referring to a motion picture, as distinct from the play. *Routledge* v. *Low*, L. R. 3; H. L. 100; *Black* v. *Imperial Book Co.*, 8 Ont. L. R. 9; *Smiles* v. *Belford*, 1 Ont. App. 436; *Murray* v. *Elliston*, 5 Barn. & Ald. 657; *Duck* v. *Bates*, 13 L. R. Q. B. 843; *Chappell* v. *Boosey*, 21 L. R. Ch. Div. 232.

The provision that the author would not exercise his

right to print the play until six months after its production in New York City, is not a limitation of the reserved rights possessed by the author. Its purpose is to delay the exercise by the author of his undoubted right to publish the play until six months after the stage representation in New York City, not otherwise to limit or grant to respondent his reserved rights.

The fact that petitioner retained the motion picture rights is not inconsistent with a license limited to a representation of the play as a spoken drama.

It would be an act of folly for the author to destroy the value of his play as a spoken drama by giving motion picture performances. He might also have published his play without copyright protection six months after its first representation in New York City, and thus have made it common property. With the loss of his common-law rights would have fallen the rights claimed by respondent. *Société Des Films Menchen* v. *Vitagraph Co.*, 251 Fed. Rep. 258.

By the amendment to § 5 of the Copyright Act of 1912, 37 Stat. 488, motion picture photoplays are classified apart from dramatic or musical compositions (subdivisions *l* and *m*). These rights are separable; "there might be a copyright for a dramatization of the old sort (acted on a stage) and also a copyright for a dramatization of the new sort (arranged in motion pictures)." *Photo Drama Motion Picture Co.* v. *Social Uplift Film Corp.*, 220 Fed. Rep. 448, 449.

In *Klein* v. *Beach*, 239 Fed. Rep. 108, the exclusive right to dramatize a book for presentation "on the stage" was held to exclude the presentation by means of motion pictures (see contract set forth at length in 232 Fed. Rep. 242).

In England, a contract covering the "acting rights" is held not to include cinema rights, nor do the words "English performances," embrace them. *Ganthony* v.

*G. R. J. Syndicate, Ltd.;* and *Wyndham* v. *A. E. Huebsch & Co., Ltd.* ("The Author," Vol. XXVI, No. 1, of Oct. 1, 1915, pp. 16, 17.) *Kalem Co.* v. *Harper Bros.,* 222 U. S. 55, distinguished.

The license was not the grant of a right in perpetuity. *Grant* v. *Maddox,* 15 M. & W. 737; *Broadway Photoplay Co.* v. *World Film Corp.,* 225 N. Y. 104.

*Mr. Charles H. Tuttle,* with whom *Mr. William Klein* was on the brief, for respondent:

The agreement, as modified, did not terminate by self-limitation at the end of the six theatrical seasons. It was not an agreement for personal services or for a naked license, but a contract of bargain and sale, whereby property was granted and conveyed. *Frohman* v. *Fitch,* 164 App. Div. 231, 233.

It goes without saying that where property is conveyed, the conveyance is presumed to be absolute and not revocable at will or for a temporary period, in the absence of clear words of limitation. *Western Union Telegraph Co.* v. *Pennsylvania Co.,* 129 Fed. Rep. 849, 867, 862.

The provision for at least 75 performances each theatrical season for a specified time was not a grant by the plaintiff but a covenant by the defendant—a statement of the least he was to do. Furthermore, the contract of modification constituted a plain recognition by both parties that the original contract was not limited to the period mentioned and that the only question which was to be considered open, was whether that contract carried the motion picture rights.

The modified contract also shows that the defendant received not a mere personal privilege, but property rights which the parties did not intend should expire by self-limitation at the end of the period referred to in the original contract.

Any construction of the contract as modified, whereby

it would be limited to the period of seasons mentioned in the original agreement, would be harsh and oppressive to the defendant.

Quite apart from the special features and circumstances, the absolute character of this grant as not limited to any fixed period of years would follow as a matter of law. 6 Ruling Case Law, § 281; *Western Union Tel. Co.* v. *Pennsylvania Co., supra,* 861; *McKell* v. *Chesapeake & Ohio Ry. Co.,* 175 Fed. Rep. 321, 329; *White* v. *Hoyt,* 73 N. Y. 505, 511; *Duryea* v. *Mayor,* 62 N. Y. 592, 597.

Even if the contract as modified is to be limited to the period of seasons mentioned in the original contract, the action must fail because premature. That period does not expire until the season of 1918–1919.

The contracts between the parties conferred upon the defendant as part of the production rights, the right to produce the play in motion picture form. The granting clause of the original contract conveyed all the production rights.

The comprehensive force of the word "exclusive" when used in a conveyance of dramatic rights, and its clear purpose to prevent competitive production, have been well stated in *Photo Drama Motion Picture Co.* v. *Social Uplift Film Corp.,* 213 Fed. Rep. 374, 376; affd. 220 Fed. Rep. 448.

The word "represent" is peculiarly appropriate to a motion picture representation of a play.

Section 4952, Rev. Stats., gave the author of a dramatic composition not only the sole right of printing it but also the sole right "of publicly performing or *representing* it or causing it to be performed or *represented* by others."

In *Kalem Co.* v. *Harper Bros.,* 222 U. S. 55, this court held that a motion picture representation of "Ben Hur" was an infringement of the author's copyright, since it was a representation of the story dramatically. See

*Daly* v. *Palmer*, 6 Blatchf. 256, 6 Fed. Cas. 1132, Case No. 3552.

Furthermore, unquestionably the grant of an exclusive right to produce, perform and represent a play purports a grant of the exclusive dramatic rights, and the "dramatic rights include motion picture rights," unless that meaning is narrowed by the addition of other words. Before the present contract was made, dramatic rights had acquired that definite and judicially determined meaning by virtue of *Kalem Co.* v. *Harper Bros., supra.* If the parties to the present contract intended this form of grant to have any less meaning, language was available to reveal that intent. *Tully.* v. *Triangle Film Corp.*, 229 Fed. Rep. 297.

In addition to the breadth of the granting clause itself, there are other provisions in the agreement which prove incontestably the mutual intent to convey the entire right to place the play before the American public in any form.

The expression of certain reservations in favor of the plaintiff was an exclusion of all others.

The courts will not easily accept a construction which would permit the plaintiff to produce motion pictures in competition with the defendant's production on the stage. The courts have frequently discerned the destructive consequences of a motion picture production of the play, synchronously with its production on the stage. *Harper Bros.* v. *Klaw*, 232 Fed. Rep. 609, 613; *Frohman* v. *Fitch*, 164 App. Div. 231, 233–234; *Photo Drama Motion Picture Co.* v. *Social Uplift Film Corp.*, 213 Fed. Rep. 374, 377.

The supplemental contract illustrates the intent of the parties to transfer to the defendant the ownership of the play for all production purposes.

The unbroken tenor of judicial decisions interpreting similar agreements establishes incontestably that the

motion picture rights were included. *Frohman* v. *Fitch, supra; Klein* v. *Beach,* 239 Fed. Rep. 108, 109; 232 Fed. Rep. 240, 246; *Harper Bros.* v. *Klaw,* 232 Fed. Rep. 609, 613; *Lipzin* v. *Gordin,* 166 N. Y. S. 792; *Hart* v. *Fox,* 166 N. Y. S. 793; *Photo Drama Motion Picture Co.* v. *Social Uplift Film Corp.,* 220 Fed. Rep. 448; *Kalem Co.* v. *Harper Bros.,* 222 U. S. 55; *s. c.* 169 Fed. Rep. 61, 63; *Klaw* v. *General Film Co.,* 154 N. Y. S. 988; *Universal Film Mfg. Co.* v. *Copperman,* 212 Fed. Rep. 301; affd. 218 Fed. Rep. 577; *Liebler* v. *Bobbs-Merrill Co.,* 162 App. Div. 900; Drone, Copyright, p. 588; Brackett's Theatrical Law, p. 61; *Lee* v. *Simpson,* 3 C. B. 871.

MR. JUSTICE HOLMES delivered the opinion of the court.

This is a suit by the author of a play called Peg O' My Heart to restrain the defendant, Morosco, from representing the play in motion pictures, in violation of the plaintiff's copyright; and also, although this is a subsidiary question, from producing the play at all. The defendant justifies under an agreement of January 19, 1912, and a supplemental agreement of July 20, 1914, both set forth in the bill. The ground upon which the right to produce the play in any way was denied was that the agreement gave rights only for five years. This construction was rejected by the District Court and the Circuit Court of Appeals. Both Courts held also that the agreement conveyed the right to represent the play in moving pictures and on that ground dismissed the bill. 254 Fed. Rep. 737. 258 Fed. Rep. 557.

By the first agreement the plaintiff, party of the first part "does grant" to Morosco, the party of the second part, "the sole and exclusive license and liberty to produce, perform and represent the said play in the United States of America and the Dominion of Canada," subject to the terms and conditions of the contract. Morosco

agrees "to produce the play not later than January first, 1913, and to continue the said play for at least seventy-five performances during the season of 1913–1914 and for each theatrical season thereafter for a period of five years." He agrees further to pay specified percentages on the gross weekly receipts as royalties, and that "if during any one theatrical year . . . said play has not been produced or presented for seventy-five performances, then all rights of the said party of the second part shall cease and determine and shall immediately revert to the said party of the first part." Morosco further agrees to present the play in first-class theatres with competent companies and with Miss Laurette Taylor (the stage name of the author's wife), in the title rôle; the play to have a production in New York and to be continued on the road for at least one season or longer if considered advisable by both parties. No alterations, eliminations or additions are to be made without the approval of the author and the rehearsals and production of the play are to be under his direction. The author to have the right to print and publish the play but not within six months after the production of the play in New York City without consent. Morosco is not to let or transfer his rights without the author's consent. "Should the play fail in New York City and on the road . . . it shall be released for stock;" i. e., let to stock companies, with an equal division of royalties between plaintiff·and defendant. By an addendum, after Miss Taylor should have finished her season her successor in the rôle of "Peg" for any subsequent tours shall be mutually agreeable to both parties. The contract is declared binding upon the parties, "their heirs, executors, assigns, administrators and successors."

The second agreement, in order to adjust controversies and to modify the first, authorized Morosco "as long as this contract is in force" to "produce, perform and represent" the play with or in as many companies as he saw fit,

without engaging Laurette Taylor and without consulting the plaintiff as to the cast, rehearsals or production of the play. Morosco also was authorized to let or sell any of his rights under the contracts, but he was not to be released from his personal liability to pay the royalties as specified in the contracts. The play might be released for stock whenever the net profits realized from all the companies producing the play should be less than $2,000, and then the royalties received from the stock theatres were to be divided equally. For four years from date neither party without consent of the other was to produce or give leave to produce the play by moving pictures and after that the rights of the parties were to be determined by and under the original agreement as if the supplemental agreement had not been made.

As to the duration of the defendant's rights we agree with the Courts below. We perceive no ground for converting the defendant's undertaking to continue the play for seventy-five performances during the season of 1913–1914, and for each season thereafter for five years, into a limit of the plaintiff's grant of rights. As was said in the District Court, it is a statement of the least that defendant was to do, not of the most that he was to have. The plaintiff was secured sufficiently by the forfeiture in case the play should not have been produced for seventy-five performances. The provisions in both contracts as to the release for stock are somewhat of an additional indication that it was expected that the arrangement was to last as long as the public liked the play well enough to make it pay, provided the defendant kept his half of the bargain performed.

On the question principally argued we are of opinion that the majority below was wrong. The thing granted was "the sole and exclusive license and liberty to produce, perform and represent" the play within the territorial limits stated, subject to the other terms of the contract.

It may be assumed that those words might carry the right to represent the play in moving pictures if the other terms pointed that way, but to our mind they are inconsistent with any such intent. We need not discuss the abstract question whether, in view of the fact that such a mode of representation was familiar, it was to be expected that it should be mentioned if it was to be granted or should be excluded if it was to be denied. Every detail shows that a representation by spoken drama alone is provided for. The play is to be continued for seventy-five performances for the theatrical seasons named. This applies only to the regular stage. The royalties are adapted only to that mode of presentation. *Harper Bros.* v. *Klaw*, 232 Fed. Rep. 609, 612. The play is to be presented in first-class theatres with a competent company and with Miss Laurette Taylor in the title role, which, of course, does not mean in moving pictures. The stipulations against alterations, eliminations or additions, and that the rehearsals and production of the play shall be under the direction of the author, denote the same thing, and clearly indicate that no other form of production is contemplated. The residuary clause, so to speak, by which the play is to drop to stock companies shows the lowest point to which the author was willing to let it go.

The Courts below based their reasoning upon the impossibility of supposing that the author reserved the right to destroy the value of the right granted, however that right may be characterized, by retaining power to set up the same play in motion pictures a few doors off with a much smaller admission fee. We agree with the premise but not with the conclusion. The implied assumption of the contract seems to us to be that the play was to be produced only as a spoken drama, with respect for the author's natural susceptibility concerning a strict adhesion to the text. We need not amplify the argument presented below against the reservation of the right in

question.   As was said by Judge Hough in a similar case, "there is implied a negative covenant on the part of the [grantor] not to use the ungranted portion of the copyright estate to the detriment, if not destruction, of the licensees' estate.   Admittedly if Harper Bros. (or Klaw & Erlanger, for the matter of that) permitted photo-plays of Ben Hur to infest the country, the market for the spoken play would be greatly impaired, if not destroyed." *Harper Bros.* v. *Klaw,* 232 Fed. Rep. 609, 613.   The result is that the plaintiff is entitled to an injunction against the representation of the play in moving pictures, but upon the terms that the plaintiff also shall abstain from presenting or authorizing the presentation of the play in that form in Canada or the United States.

> *Decree reversed.   Injunction to issue upon the condition that the plaintiff shall neither represent nor authorize the representation of the play Peg O' My Heart in moving pictures while the contract with the defendant remains in force.*

MR. JUSTICE CLARKE, with whom concurred MR. JUSTICE PITNEY, dissenting.

The decision of this case involves the construction of the written contract of January 19, 1912, as modified by that of July 20, 1914, and, centering its attention upon the claim of the defendant to moving picture rights, the court dismisses in a single paragraph provisions in these contracts which seem to me to so clearly limit the rights of the defendant to a term expiring possibly in May, 1918, but certainly not later than May, 1919, that I cannot concur in the conclusion arrived at by my associates.

The court says:

"As to the duration of the defendant's rights we agree with the Courts below.   We see no ground for converting the defendant's undertaking to continue the play for seventy-five performances during the season of 1913–1914,

and for each season thereafter for five years, into a limit of the plaintiff's grant of rights. As was said in the District Court, it is a statement of the least that defendant was to do, not of the most that he was to have."

This expression that the third paragraph of the contract of January 19, 1912, "is a statement of the least that defendant was to do, not of the most that he was to have," is repeated in the opinion of each of the three courts as the sufficient reason for concluding, as the District Court said, that the contract gave to the defendant "all the rights mentioned *for all time*." It is not the first time that a catchy phrase has diverted attention from less picturesque realities.

My reasons for concluding that the rights of the defendant were limited, as the court says his obligations were limited, to a term expiring not later than the close of the theatrical season of 1918–1919 may be briefly stated.

The grant which it is concluded gave the defendant the "exclusive license and liberty to produce, perform and represent" the play involved "for all time" is in these words:

"First: The party of the first part hereby grants . . . . . - to the party of the second part *subject to the terms, conditions and limitations hereinafter expressed*, the sole and exclusive license and liberty to produce, perform and represent the said play in the United States" and Canada.

In terms this is a "license" and in terms also it is subject to "conditions and limitations" to follow in the contract,—which are found in the third and fifth paragraphs.

The third paragraph reads:

"The party of the second part [defendant] agrees to produce the play not later than January first, 1913, and to continue the said play for at least seventy-five per-

formances during the season 1913–1914 and for each theatrical season thereafter for a period of five years."

The fifth paragraph provides that if the defendant shall fail to produce the play seventy-five times in any one theatrical year "then all rights of the said party of the second part [the defendant] shall cease and determine and shall immediately revert to the said party of the first part."

This third paragraph expresses the agreement of the parties as to what the defendant was to do in consideration of the grant by the plaintiff in the first paragraph, and reading it and the fifth paragraph together, as one, we have the extreme extent and time limit of the defendant's obligation and the penalty, forfeiture, is provided for the failure to perform at any time within that limit. The court says that the third paragraph expresses "the least [all] that defendant was to do," so that his obligation under the contract ended with the five-year period, which obviously would be not later than the close of the theatrical season of 1918–1919. This being true, when did the reciprocal obligation of the plaintiff expire?

That the obligation of the plaintiff continued "for all time" is apparently derived wholly from the inference, as stated by the District Court, that the parties, if they had intended otherwise, "could readily have fixed a time limit in paragraph 'First' by the addition of words such as 'for . . . years from' or 'until' a stated date."

It is very true that the parties could have written their contract in a different form, and certainly with much more precision of statement, than that in which they did write it, but it is also true that in making it in their own way and terms they granted a general license in the first paragraph, but made it subject to the "terms, conditions and limitations" thereinafter to be expressed, and that they then went forward and expressed in the third paragraph the five-year limitation as we have seen it. The

court holds that this five-year limitation applies to the defendant's obligation to perform but that it does not apply to the plaintiff's license to produce. I think it applies to both. Plainly the parties were undertaking to set down in their contract the mutual obligations which each intended to assume—those of the one in consideration of those of the other. The author granted the privilege of producing the play and the defendant agreed to produce it for at least seventy-five performances during each of five years. After that, the court concludes, the defendant was no longer bound by the contract to do anything which could advantage the plaintiff and therefore, clearly, the plaintiff should not continue thereafter under obligation to the defendant, unless the intention to be so bound is unmistakably expressed in his contract. The "natural and normal" inference is that when the obligation of one party to such a contract as we have here is ended it was the intention that the obligation of the other party should end also.

The inference that the license to produce continued after the obligation to produce expired, in my judgment, can be sustained only by neglecting the specific provision of the first paragraph, that the license granted is subject to the limitations which should follow, and which did follow in the third paragraph. It involves imposing, by judicial construction, heavy and unusual burdens upon the author of a successful dramatic composition in the interest of a commercial producer—a result which courts should not strain themselves to accomplish.

A penalty of forfeiture being provided for failure of the defendant to perform at any time, I cannot see any substantial reason for inserting the five-year limitation except to fix a limit for the expiration of all rights of both parties and this, it seems to me, was its only function.

The provision in the first contract that if the play should fail "in New York City and on the road," and in the

second that if the net profits for "one theatrical season" should be less than two thousand dollars, the play should be "released for stock" and the royalties divided equally between the parties, would have ample scope for application within the five-year period and therefore cannot properly be made the basis for the implied continuance of the license beyond that term.

For the reasons thus briefly stated, I think that the parties expressed with sufficient clearness their intention that their mutual relations should all terminate with the expiration of the five-year period, and therefore I dissent from the opinion of the court.

MR. JUSTICE PITNEY concurs in this opinion.