## MURPHY v. NORTH AMERICAN LIGHT & POWER CO. et al.

### WALTERS et al. v. SAME.

#### Nos. 281, 282.

Circuit Court of Appeals, Second Circuit.

July 26, 1939.

Edward H. Green, John Foster Dulles, and John C. Bruton, Jr., all of New York City (Sullivan & Cromwell, of New York City, of counsel), for appellant North American Co.

William M. Dederick, of New York City (William M. Dederick, Max Berkow, Louis Braun, and Edward B. Margolies, all of New York City, of counsel), for appellee John H. Murphy.

Lawrence R. Condon, of New York City (Lawrence R. Condon, Robert T. Woodruff, and Leroy E. Rodman, all of New York City, of counsel), for appellees John W. Walters et al.

SWAN, Circuit Judge, dissenting in part.

Before SWAN, AUGUSTUS N. HAND, and PATTERSON, Circuit Judges.

AUGUSTUS N. HAND, Circuit Judge.

The above suits were consolidated and heard by the District Court on an agreed statement of facts and resulted in identical decrees against the defendant. They were suits by preferred stockholders of Power Company asserting by derivation alleged rights of that company against North American under a contract dated March 27, 1931.

The Power Company is a public utility holding company organized under the laws of Delaware and at the date of the contracts had 2,000,000 shares of authorized common stock, without par value, of which 1,516,586 shares were outstanding. North American and Middle West Utilities Company (herein called Middle West) each then owned 43% of the common stock. Since January, 1933, the personnel of the management of Power Company has been subject to the approval of North American.

In the winter of 1930–1931 Power Company was in need of financing. To accomplish this financing it issued and sold to the public in 1931 $10,000,000 Serial Gold Notes, $2,000,000 maturing on April 1 of each year from 1932 to 1936, inclusive. To insure payment of the notes North American and Middle West made the agreement of March 27, 1931, with Power Company. The rights of Power Company under the agreement were as-

signed to a trustee as collateral security for the notes.

The agreement (after reciting that Middle West and North American were largely interested in the stock of Power Company and that the latter was about to sell the Serial Gold Notes and was desirous to issue and sell its common stock annually in each of the years 1932 to 1936, inclusive, for the purpose of securing funds for the retirement of the notes at their maturity) provided that Power Company should annually offer to its common stockholders of record on March 5 in each of such years the right of purchasing ratably, according to their respective common stock holdings, an aggregate amount of the then unissued common stock of Power Company sufficient to produce at the offering price (determined as hereafter stated) a cash sum of $2,000,000 in each of said years. It further provided that Power Company might at its option at any time offer to its common stockholders shares then in its treasury in lieu of unissued shares. The offering price was to be "that number of whole dollars which shall most nearly equal (and for this purpose a fraction of one-half shall be treated as if less than one-half) seventy-five per centum (75%) of the average closing price per share of the Common stock of the Power Company on The Chicago Stock Exchange averaged for the last ten trading days next preceding March first in each respective year in which such offer of Common stock is made to the Common stockholders." The offering was to be open for acceptance and payment by such stockholders to and including March twenty-fifth next following the date on which each offer was made.

North American and Middle West jointly and severally agreed with Power Company to purchase for cash at the prices at which the stock was offered to the common stockholders all shares so offered which had not been purchased by such stockholders on or before March 25 in each respective year, payment to be made between March 26 and March 30, inclusive, in each year.

The Power Company agreed to issue and sell its shares to its common stockholders and to Middle West and North American purchased by them respectively, pursuant to the contract, and to take all steps necessary to that end. For that purpose Power Company agreed to keep on hand 250,000 shares of its then unissued common

stock (except as sales and deliveries were made therefrom).

The agreement also provided that the Power Company was privileged at any time by due corporate action "to reclassify and/or rearrange its common stock * *" and "in the event of any such reclassification and/or rearrangement, the shares of stock taking the place of the now authorized shares * * * shall stand in lieu thereof, and be subject to the terms of this agreement in like manner as the Power Company's presently authorized common stock. The Power Company shall also be privileged at any time to increase the amount of its authorized common stock."

Then followed article five of the agreement, the interpretation of which is the critical matter before us: "5. If at any time it shall become legally impossible for the Power Company to offer for sale and/or to sell and deliver sufficient shares of its common stock to provide funds sufficient to retire all of the notes of said issue as the same respectively mature, as contemplated by this Agreement, then and in that event Middle West Company and The North American Company jointly and severally agree with the Power Company that they will upon the maturity of such notes purchase for cash at par, plus accrued interest, such of said notes as shall not have been retired by the application of the proceeds of the sale of common stock of the Power Company as herein provided."

There was a further provision that the agreement was for the express benefit of the trustee for the noteholders and the parties thereto, and that no stockholder of Power Company as such, except the two underwriters, should have any rights under it.

At the time the agreement went into effect Power Company had outstanding its preferred stock and 1,516,586 shares of common stock. The price range of the common on the Chicago Exchange between November 1, 1930, and April 1, 1931, was from 60 to 70⅝ dollars per share.

The gist of the cause of action which the complainants assert on behalf of Power Company is that in 1935 and in 1936 North American violated the contract of March 27, 1931, in that it did not purchase stock of Power Company but instead took a note of the latter each year for $2,000,000 which it advanced to pay off the Serial Gold Notes falling due in these years. Middle

West failed to perform its part of the joint and several obligations in March, 1932, because it went into the hands of a receiver shortly thereafter, and North American necessarily had to perform all future obligations ' accruing under the agreement. There is no controversy as to performance of the contract by North American in 1932, 1933 and 1934.

By the letter of February 19, 1932, North American agreed to have the stock in that year offered at $15 per share rather than at $12 per share which would have been the price as determined by the formula in the contract of March 27, 1931. On this basis 133,334 shares were offered. The other stockholders subscribed for a few shares and North American paid for the balance. Thus the $2,000,000 of serial notes due April 1, 1932, were retired.

On March 1, 1933, the average closing price of the stock on the Chicago Exchange for the ten trading days preceding was $3.179. Three-fourths of this figure was $2.384 so that the offering price according to the formula was $2 per share. The number of unissued shares was insufficient to cover the necessary offering of 1,000,000 shares at the formula price. Accordingly, the number of authorized shares was increased from 2,500,000 shares to 3,500,000 shares, without par value, and North American caused the common stock owned by it to be voted in favor of the increase. An offering of 1,000,000 shares was made to stockholders at $2 per share and 107,870 shares were subscribed for by stockholders other than North American. North American took the balance of 892,130 shares. The proceeds thus realized were used to pay off the notes which became due April 1, 1933. The purchase by North American at this time made it holder of a majority of the common stock.

In 1934 North American waived an offering to stockholders (the latter having waived their preemptive rights to subscribe) and took 833,334 shares at $2.40 per share, which was the market price. The purpose was to avoid large expenses which would have been incurred in registering the issue under the Securities Act of 1933, 15 U:S.C.A. § 77a et seq. It was again necessary to increase the number of authorized shares. The executives of Power Company were in favor of increasing the common stock to a number sufficient to take care of the requirements for 1934, 1935 and 1936 but this plan was not satisfactory to North American. North American did vote its stock in favor of an increase in authorized common from the 3,500,000 authorized in 1933, to 3,625,000 shares. The common stock at this time was changed from no par value to $1 par value. The proceeds from the sale of the 833,334 shares to North American retired the $2,000,000 notes due April 1, 1934.

In 1935 North American refused to purchase stock, and this is the complainants' first grievance. The operations of the Power Company for 1934 had shown a deficit. Its stock was selling at 87½ cents a share early in January, 1935. On or about January 2, North American advised the Power Company orally that it did not believe that an offering of stock could properly be made under the circumstances and that accordingly it was not obliged under the contract of March 27, 1931, to underwrite an offering. On or before February 23, 1935, North American told the Power Company that due to change of circumstances since the execution of the contract North American would not vote its shares for an increase in the authorized common stock and would not purchase any additional shares unless compelled to do so by court decree, but would purchase the notes maturing April 1, 1935. In view of this position of North American the Power Company decided that it was not advisable to incur the expense of going through the form of making an offering of new stock. It did, however, call a stockholders' meeting for March 25, 1935, to pass on an increase of authorized common stock from 3,625,000 shares to 7,625,000. The issued shares were then 3,621,169 and no more than 3,831 shares could be issued without an increase in the authorized limit. The average closing price on the Exchange for the ten days preceding March 1, 1935, was 62½ cents; 75 per cent of this would be 47 cents, and the nearest "whole dollars" under the formula would be $1. An offering of stock under the contract would consequently have required 2,000,000 shares. On March 22, 1935, North American advised the Power Company that it disapproved of filing a registration statement under the Securities Act of 1933 with reference to any offering of new stock for the purpose of meeting the April 1, 1935, maturity of the serial notes but that it would furnish funds to take up the $2,000,000 notes then maturing. At the stockholders' meeting of the Power Company on March 25, less than a majority of the

preferred stock was represented. The meeting was accordingly adjourned to April 23, at which a majority of the preferred stock was represented. While North American had on March 14, 1935, given proxies to authorize an increase in shares from 3,625,000 to 7,625,000, it withdrew its proxies on April 19, 1935, and declined to vote for the increase at the meeting of April 23. At an adjourned meeting held on August 13, 1935, North American having reinstated its proxies voted for the above increase of common stock of the Power Company to 7,625,000, which was effected accordingly.

On March 26, 1935, an agreement was made between the companies that North American would pay off the $2,000,000 serial notes and would take a note from the Power Company for the same amount, North American agreeing that if it should later, according to court decree, purchase common stock in connection with providing funds for payment of the maturing notes, it would deliver the note in payment pro tanto for such stock and refund any interest received. North American accordingly made payment of the notes due April 1, 1935, and took a new note of $2,-000,000 from the Power Company.

In 1936 North American again refused to purchase stock; instead, it took up the maturing notes and received a new note for $2,000,000. The market price for stock, computed under the contract, was $3.59 a share; 75 per cent would be $2.70, and nearest whole dollars would be $3. There were then sufficient authorized shares for an offering of 666,667 shares to stockholders at $3 a share, the authorized common stock having been increased in August, 1935. But no offering was made. The Public Utility Holding Company Act of 1935 (15 U.S.C.A. §§ 79 to 79z—6) had taken effect on December 1, 1935. In November or December, 1935, North American informed the Power Company that because of the "death sentence" in the Act it did not consider that an offering of stock to Power Company stockholders could properly be made and that it was not prepared to take up any stock so offered unless compelled to do so by court decree.

The Board of Directors of Power Company at a meeting on November 27, 1935, resolved, in view of the decision of the board, not to register under the Public Utility Holding Company Act of 1935, to defer any action to determine the rights of that company against North American under the Agreement of March 27, 1931, until there had first been an appropriate judicial determination with respect to the validity and application to Power Company of the Act. This resolution was adopted "subject to there being arrived at with the North American Company an understanding that the delay involved will not be held by them to prejudice the rights of this Company under the said Agreement * * * ." Accordingly, on December 11, 1935, Power Company wrote the following letter to North American which accepted it on December 17, 1935:

"Referring to our letter of August 17, 1935 and your reply thereto of August 28, 1935, in view of the situation created by the Public Utility Act of 1935, it seems advisable to defer any action to determine the rights of North American Light & Power Company against The North American Company under the agreement dated March 27, 1931, between North American Light & Power Company, Middle West Utilities Company and The North American Company, until there has first been an appropriate judicial determination with respect to the validity and application to this Company of the Public Utility Act of 1935 and more particularly Section 11 thereof, provided that the delay involved in the deferment of such action will not be held by The North American Company to prejudice the rights of this Company under said agreement of March 27, 1931.

"If you will sign and return the enclosed duplicate of this letter as confirmation of the understanding between us to the above effect, we shall be guided accordingly."

Neither company registered as required by the Act. The Power Company brought suit to test its constitutionality. North American paid the $2,000,000 notes due April 1, 1936, and took a note of the Power Company for the same amount, under an agreement that in case it should later purchase common stock pursuant to determination of a court, it would give up the note for the stock and refund any interest received.

In 1937 both companies registered under the Public Utility Holding Company Act of 1935.

The District Court held that an offering of stock was not a legal impossibility either in 1935 or in 1936, that North American had no right to confine its obli-

gations under the contract to the purchase of the notes as provided by paragraph 5, and that it should not have prevented offerings of stock in the manner called for by the contract. The judgment was that North American surrender the $2,-000,000 note taken in 1935 and interest, against delivery of 2,000,000 shares of stock, and surrender the $2,000,000 note taken in 1936 and interest, against delivery of 666,667 shares, jurisdiction being retained to modify these requirements in case changed conditions or administrative rulings should prove them unfair.

It is plain that the primary obligation of North American under the contract was to purchase and pay for such shares of stock as might not be taken by common stockholders on the prescribed offerings. There was, under paragraph 5, an alternative obligation to purchase the notes, but that alternative was not one to be taken on the mere choice of North American. It could be availed of only in case it should become "legally impossible for Power Company to offer for sale and/or to sell and deliver sufficient shares" to raise the necessary $2,000,000. North American, to sustain its conduct in declining to take stock in 1935 and 1936 and advancing the funds as a loan to Power Company, must show that the case was one of legal impossibility within the meaning of paragraph 5.

*The 1935 transaction.*—No offering of stock to stockholders was made by Power Company, and no tender was made to North American. Performance of these conditions was excused by the stand taken by North American. It had already told Power Company that it would not vote its shares in favor of an increase in the authorized shares and would not purchase any shares tendered to it. There could be no offering of stock without an increase in the authorized shares, and there could be no increase unless North American voted in favor of it. North American does not deny that its announcement of refusal to vote its shares for an increase prevented an offering of new shares by the Power Company. It urges that it was under no obligation to vote its shares for the increase indispensable to a valid offering and that the consequent shortage of shares made the case one of legal impossibility.

It was impossible for the Power Company to make an offering of unissued shares, because the shares did not exist; but the impossibility was brought about by refusal of North American to permit the creation of the new shares.

We think that under the agreement of March 27, 1931, there was an implied obligation on the part of North American to cooperate in the issue of a sufficient number of shares to enable the Power Company to offer them to it for sale at the formula price. At the time of entering into the contract North American and Middle West owned between them 86% of the common stock. At that time it would have been impossible to increase the capital stock without their cooperation in voting their shares for the increase. North American relies upon the fact that 250,000 shares had been reserved under the provisions of the agreement to provide for future offerings, and that the market price of stock at that time was high enough to render the reservation ample for future offerings. Nevertheless, the parties could have no assurance that the price would not fall and that the shares reserved would not thus prove insufficient. But we are not limited to speculation on this point, for the precise question as to a possible future need for an increase of common stock was raised by Martin Insull, acting for Middle West, contemporaneously with the signing of the agreement. Shortly afterward the president of Power Company, in a letter to both Middle West and North American, said that it was the understanding of Power Company that its obligation to make offerings of the stock in each of the years was "not modified or lessened by the undertakings contained in the fifth paragraph" of the agreement relating to legal impossibility. North American replied that it had no suggestions to offer with respect to the above letter of explanation from the president of Power Company and that the letter had been filed with its executed counterpart of the agreement. Inasmuch as it clearly appears that all parties realized that an increase of stock might be necessary to carry out the underwriting agreement it seems most unlikely that these underwriters, holding as they did most of the common stock, did not intend to incur an obligation to exercise their control for the purpose of enabling the Power Company to have a sufficient supply of stock to offer. While the letter of Power Company defined "legally impossible" as relating to "conditions beyond control of the officers and directors" of the Power Company it did not purport to define the obligations of

North American and Middle West and, in our opinion, it is in no way inconsistent with the obligation of the latter (implicit in the situation) to cooperate in necessary increases of the stock of Power Company. The provision in paragraph 4 of the agreement that "the Power Company shall also be privileged at any time to increase the amount of its authorized common stock" lends additional weight to the argument that the underwriters were under a reciprocal obligation to use their voting power in aid of the privilege. Moreover, in 1933 and 1934 North American actually voted its stock in favor of increases necessary to offerings of stock for these years under the contract. In view of all the circumstances, we think that North American was not at liberty to block the offering of stock in 1935 by refusing to vote for an increase. See Manners v. Morosco, 252 U.S. 317, 40 S.Ct. 335, 64 L.Ed. 590; Kirke La Shelle Co. v. Paul Armstrong Co., 263 N.Y. 79, 188 N.E. 163; Wigand v. Bachmann-Bechtel Brewing Co., 222 N.Y. 272, 118 N.E. 618; Patterson v. Meyerhofer, 204 N.Y. 96, 97 N.E. 472; Williston on Contracts, Rev'd Ed., §§ 677, 1293A.

■ It is argued that the formula contemplated that all offerings should be below the market price, that the formula was not applicable to 1935 conditions, and hence that the contract must fail for want of the essential matter of price. Literally the formula was applicable. It was provided in paragraph 1 of the contract that the price per share "shall be that number of whole dollars which shall most nearly equal * * * seventy-five per centum" of the market. With an average closing price for 1935 of 62.5 cents per share, 75 per cent is 46.875 cents, and "that number of whole dollars most nearly equal" to 46.875 cents is $1. It is further argued that the parties could not have contemplated an offering at more than the market, and that hence North American should be relieved of its obligation because of change of circumstances. It is to be remembered in this connection that in 1933 North American had taken most of the shares at only $2 a share and in 1934 all of the shares at $2.40 a share. It is idle for it to say, in the face of this practical construction of the contract under which it bought shares at the low figures of $2 and $2.40 in a company whose shares were selling between $60 and $70 when the contract was made, that the situation had so changed in 1935 that performance was excused on the ground of "legal impossibility". It is to be remembered that North American was not expecting to buy shares for purposes of sale but was investing its funds in a subsidiary in which it held a substantial interest. It was to do this over a long period and began to do it in a time of financial depression. We think it clear that under such circumstances it took the risk of what the terms of the contract called for. Moreover, if North American in 1935 objected to investing above the market it could have used its stock control to reduce the number of shares outstanding and thus so to increase the price, that the offering would not be above the market. Indeed, this case does not present the hardship frequently arising where the price has collapsed between the making of a contract for a purchase at a fixed price and the time of performance, for here the contract price was not fixed but depended on fluctuations of the market.

■ While the offering in 1935 would have required registration under the Securities Act of 1933, registration was clearly excused by the statement of North American that it would not vote for an increase in stock and by its specific protest against registration.

Thus North American was not excused from underwriting the issue of shares in 1935.

■ *The 1936 transaction.*—The objections made by North American to requiring it to underwrite an offering of stock in 1935 have no application to 1936. In 1936 there were authorized shares on hand sufficient to cover the contemplated offering; the offering price under the formula was $3, which was less than the market; the number of shares to be offered would have been less than the number offered in 1933 and 1934 and taken, in large part, by North American. The only legal impossibility claimed for 1936 is that neither the Power Company nor North American had registered under the Public Utility Holding Company Act and that no approval of the offering had been obtained from the Securities and Exchange Commission. By that Act registration of a company and approval by the Commission were prerequisites to an offering of stock.

It may be assumed, without conceding the point, that the refusal of the Power Company to register, until the constitutionality of the Act had been tested, was prompted by considerations other than

those related to the contract of March 27, 1931, and it may also be assumed that if North American had any part in the decision of the Power Company not to register, North American acted with a view to apprehended risks due to 'the socalled "death sentence" clause of the Act and not with reference to the contract. Hence, we will assume, though not concede, that the refusal to bring about the registration of the Power Company and to seek to obtain the approval of the Commission for an offering so that the stock could be issued and purchased prior to April 1, 1936, was justified.

But by the letter of the Power Company to North American of December 11, 1935 (quoted supra), and confirmed by North American on December 17, 1935, the two companies had agreed that any delay in the determination of their rights under the contract of March 27, 1931, which might be due to non-registration and to the test of the constitutionality of the Act in the courts, should not prejudice the rights of Power Company under such contract. In our opinion this letter amounted to a waiver and extension of the time for the offering of the stock under the contract. In the winter of 1937 both companies registered under the Act. North American should then have caused Power Company to apply to the Commission for an approval of an offering on the terms applicable to the year 1936. If the Power Company had then obtained the approval of the Commission for such an offering North American would have been obliged to underwrite the offer as agreed.

■ The parties should as nearly as possible be put in the position they would have occupied had the contract been performed.

■ An offer by Power Company should be made to all its stockholders and not to North American alone as the decrees have provided. Accordingly, there must be a modification of the decrees in respect to the form of the offerings. Justice to the other stockholders requires that they should not be deprived of their preemptive rights to the stock issuable either in 1935 or 1936.

We have said that North American should have procured the Power Company in 1935 to offer 2,000,000 shares of common stock at $1 per share. It failed to do this and instead made a loan upon which it received interest that would not have been payable by Power Company if the contract had been performed according to its terms. Accordingly, North American should repay to Power Company any interest received from the latter and should surrender the note of Power Company dated April 1, 1935; and North American and Power Company should cause 2,000,000 shares of common stock of Power Company to be offered to the common stockholders of the latter of record on March 5, 1935, at a price of $1 per share; and North American should take up any shares not subscribed for by the other stockholders. All the foregoing requirements as to the offering for 1935 are conditioned upon the approval by the Commission of such an offer.

In respect to the offering for 1936, North American and Power Company should have Power Company offer to its common stockholders of record on March 5, 1936, 666,667 shares at $3 per share, and North American should be directed to take up the shares not subscribed for by the other stockholders. North American should also surrender to Power Company the note dated April 1, 1936, and should repay to Power Company any interest it received upon said note. All the foregoing requirements as to the offering for 1936 are conditioned upon the approval of the Commission of such an offer.

In the event that the Commission approves of the issue or issues, any amounts paid in cash to Power Company for the stock by other shareholders should be turned over by it to North American and the latter should also be credited on its underwriting obligations with the amounts of the notes of Power Company representing advances made by North American and herein directed to be given up.

In the event that the Commission should decline to approve of offerings of stock for the years 1935 or 1936, as above provided, the complainant may apply to the District Court for such other or further relief as may be just and proper.

Modified decrees shall enter in accordance with this opinion.

SWAN, Circuit Judge (dissenting in part).

Paragraph 5 provides for purchase of the maturing notes by North American "if at any time it shall become legally impossible to offer for sale * * * its common stock * * * as contemplated by this agreement." The agreement contem-

plated that the offering price—the nearest dollar to 75 per cent. of the market price—should be less than the market price, for obviously the parties did not contemplate offering the stock to stockholders above the market price. When in 1935 the contract formula produced an offering price higher than the market price, I think that it was "legally impossible" to offer the stock "as contemplated by this agreement." Hence, in my opinion, the condition was fulfilled which permitted North American to take up the notes maturing on April 1, 1935.