Burke, J. (dissenting).
The majority would affirm a decision of the Appellate Division reversing Special and Trial Term and dismissing a complaint on the ground that where a licensor does not have “ property ” rights in an intellectual product, so far as the Copyright Act and the general rules of common law are concerned, he must show that the licensee expressly covenanted that it would not use the granted rights in media other than that in which rights are granted: In other words, from now on the scope of a grant in a license contract depends not on the parties ’ intention which is reflected by the bargain they made, but only on status.
No other reported decision reaching such a result can be found. The decision represents an abrupt departure from the established concepts governing the existence and nature of literary and artistic rights. In New York and California, which are centers of the American artistic world, ideas, even though common or open to public knowledge, are protected if there is a contract between the parties prior to disclosure of the idea (Ann. 23 A. L. R. 2d 244, 328, § 24, and cases cited therein). *974 Heretofore once an idea became the subject matter of a contract, the contract forever precluded licensees from the right enjoyed by all others to the use of the idea, wherever obtained, whether from the public domain or independent creation, without complying with the obligations of the contract (High v. Trade Union Courier Pub. Corp., 31 Misc 2d 7, affd. 275 App. Div. 803; Gellert v. Dick, 277 N. Y. 123; Chandler v. Roach, 156 Cal. App. 2d 435).
The duty of a licensee not to exceed the express limits of its grant is no less a part of the consideration flowing to the licensor than its duty to pay the stipulated royalties. The obligation not to exceed the scope of the grant cannot be avoided any more readily than the obligation to pay royalties. The enforcement of both obligations is based on contract, not property. ‘ ‘ By entering into the contract and accepting and retaining the consideration therefor, the respondents assumed a fiduciary relationship which had its origin in the contract, and which imposed upon them the duty of utmost good faith.” (Kirke La Shelle Co. v. Armstrong Co., 263 N. Y. 79, 85.)
The question, therefore, is not whether plaintiff had a legally recognized property right or particular “ status ” but whether a breach of fiduciary duty has occurred which has its origin in contract for which the licensee must be held. We think there was such a breach of contract.
The action arises from the release and sale by Decca Records, under a grant from Universal Pictures, which Decca controls, of phonograph records embodying most of the musical portion of the sound track of Universal’s motion picture, “ The Glenn Miller Story”. Decca Records paid nothing to Universal Pictures or plaintiff for this right, sold the records in competition with records on which plaintiff was receiving royalties, and has received substantial profits from the recordings.
In Decca’s publicity attending the exploitation of the records, the Miller name and reputation, and the unique quality of the Miller music, were emphasized. Thus, on the reverse side of the cover of the “ sleeve ” captioned “ The Glenn Miller Story ”, in which the Decca record was sold, we find: “ Although few bands achieve it, every band wants to have a sound all its own. Glenn Miller got the organization, trained the men, scored the arrangements, and finally made a band that had a sound like no other, a rich, golden sound, a sound like . . . Glenn Miller.” “ These recordings preserve the Glenn Miller char *975 acter. Those who were old enough to remember it will cherish this re-animation; those who have never heard that amazing leader will thrill to a great and exciting sound—a sound which no band has ever surpassed.”
It is plaintiff’s contention that defendant’s sale of records made from the sound track is a breach of the contract which she had with Universal authorizing the making of the sound picture “The Glenn Miller Story”, based on the life and musical success of her husband.
Plaintiff is, as defendants knew, the recipient of royalties from the sale of RCA records of Glenn Miller, and claims her royalties have been reduced by the competing sale of records made from the sound track from ‘ ‘ The Glenn Miller Story ’ ’.
Defendants assert that “Universal could have made the musical sound track and used it to make records without any contract with or leave from plaintiff ” and “ as Universal was free to make the musical [portion of the] sound track and any recordings therefrom without any license from plaintiff, it could be placed under restraint in the use of its musical sound track only by a contractual undertaking, clearly expressed, that it would not make some particular use of the sound track ’ ’.
The contention is based on a faulty analogy with cases such as Chaplin v. Amador (93 Cal. App. 358) and Supreme Records v. Decca Records (90 F. Supp. 904) where the litigants were not parties to a contract which covered the subject matter of the lawsuit.
These cases establish what no one disputes but they do not hold that a licensee who has bargained for the use of arrangements, compositions and orchestrations in connection with music to be made part of a sound track in the preparation and production of a sound picture, and used them, can breach its agreement in subsequent dealings with the sound track. The holding of the Appellate Division that the sole consideration is whether plaintiff had any legally recognized “property interest” in the Miller material and performances resulted, it seems to us, from a failure to differentiate this case concerning a musical sound track made pursuant to a contract authorizing the making of a sound picture, and the cases which have held that strangers are privileged to make imitations where the copyists have used independent performances rather than ‘1 dubbing ’ ’ or mechanical devices (Supreme Records v. Decca Records, 90 F. Supp. 904, supra; Chaplin v. Amador, 93 Cal. App. 358, supra).
*976 Since sound tracks are an integral part of “photoplays" (Jerome v. Twentieth Century Fox-Film Corp., 67 F. Supp. 736, 741), defendants, in order to sustain their theory that Universal’s right to use the musical sound track was not dependent on any grant from plaintiff, but rather an exercise of the rights of independent imitators, were required to show either that the musical portion of the sound was made before the agreement was entered into, or that Universal did not contract at all in respect to such musical portion of the sound track. They have failed. The musical portion of the sound track was made after Universal signed the agreement, made expressly for the picture and would never have been made had there been no picture. The agreement, as well as the declarations of Universal, prove that Universal contracted not only generally for authorization to make a sound track for “ The Glenn Miller Story”, but in particular the musical portion of the sound track.
Tn not one of the cases relied on by the Appellate Division and respondents was there an agreement in writing dealing with specific obligations. Absent an agreement, any one could independently create a musical sound track and use it free of any claims of plaintiff. But the defendants may not do so. Universal gave up that right by the contract.
The fundamental law is that where there is an agreement in writing the parties to the contract must remain faithful to its terms whether or not the disclosure is novel or original. Chandler v. Roach (156 Cal. App. 2d 435, 441-442, 444, supra) is expositive of the rationale upon which this proposition rests:
‘ ‘‘ Even though the idea disclosed may be 1 ‘ widely known and generally understood” * * *, it may be protected by an express contract providing that it will be paid for regardless of its lack of novelty * * * ’.
“ We believe that if a producer obligates himself to pay for the disclosure of an idea, whether it is for protectible or unprotectible material, in return for a disclosure thereof he should be compelled to hold to his promise. There is nothing unreasonable in the assumption that a producer would obligate himself to pay for the disclosure of an idea which he would otherwise be legally free to use, but which in fact, he ivould be unable to use but for the disclosure. * * *
“ 1 The test for a property right, applied in common law copyright cases, is that the work be new, novel and in concrete form. * * *
*977 “ ‘ Not only is this property right test not a part of any traditional contract action, but there is no reason for applying such a test in this particular type of contract action. The reason for the requirement in common law copyright was that to have a remedy good against the world, a property right must be shown. This reason for the test is missing in an action on a contract.’ ” (Emphasis added.)
In this matter Universal obligated itself to pay for the disclosure of the Miller ideas of “ composition ”, “ arrangement ” or ‘ ‘ adaptation ’ ’ of the scores which were to be played as part of the sound track and which it might otherwise be legally free to try to imitate, but which in fact, according to Universal’s own public declarations, it would be unable to use in this motion picture but for the agreement. Under the agreement, Universal could not make the sound track or any portion of it a part of the picture without consent of plaintiff, as the picture could be made only from a scenario approved in writing by the plaintiff.
It is clear that Universal sought “all of G-lenn Miller’s musical compositions, arrangements and orchestrations now owned by you, as well as the right to use or simulate the style, manner and manner of playing of G-lenn Miller and/or his orchestra”. In this clause, the parties expressly and specifically agreed upon the media in which Universal was given permission to exercise said “right”, i.e., “for use in the preparation and production of said photoplay or photoplays and productions.” The very contracting for the right to make such use establishes the intent at the time the contract was drawn as to the purpose of the grant sought and the permissible use of the sound track.
The claim, moreover, that Universal did in fact, as it had agreed to, make use of the arrangements and orchestrations furnished by the plaintiff in simulating the style and manner of playing Glenn Miller music in the preparation and production of the sound picture, is supported by substantial evidence. Thus, in the “Publicity Promotion Exploitation Kit”, which it widely distributed, Universal announced: “Because the musical sequences of ‘ The Glenn Miller Story ’ are being recorded in the new stereophonic sound technique, Producer Aaron Rosenberg and Director Anthony Mann found it necessary to discard the actual use of original Miller performances available on (Victor) [RCA] recordings, (Chesterfield) radio programs and tapings of Miller’s shows during military service *978 both in the [United States] and abroad. Instead, Universal-International has managed to acquire all of the original manuscripts in Miller’s library, and copyists have even traced, note for note, the ad lib solos in these tunes which are being re-recorded verbatim for the film sound track ” and Universal also advertised that Gershenson recorded the Miller numbers ‘ ‘ using verbatim the original arrangements written by Miller ’ ’ (emphasis added). Universal’s announcements show that the use of “ stereophonic sound technique ” — a discovery which outmoded prior recordings—made it necessary to “ discard ” Glenn Miller’s original recordings for RCA, and that Universal used the material it had “ managed to acquire ” from plaintiff, instead, in making the sound track.
Universal says it has not bargained in regard to the musical portion of the sound track, but the contract and its other conduct shows that it has. The contracting for the delivery of “ all of Glenn Miller’s musical compositions, arrangements and orchestrations now owned by you ’ ’, as well as the right to use or simulate the style, manner and manner of playing of Glenn Miller and/or his orchestra, is persuasive in plaintiff’s favor on that question. The importance of the evidence of intent to bargain in connection with the musical part of the sound track, which lies in the declaration made by Universal that “ Gershenson * * * recorded * * * the [Miller] numbers * * * using verbatim the original arrangements written by Miller ”, cannot be disputed. Moreover, Universal acknowledged its obligations and the existence of conditions when in 1953 it sought to justify the license to Decca under its “ advertising rights ”.
If Universal did not need the name, arrangements or ‘ ‘ right to use or simulate the style * * * of Glenn Miller ” to make the musical portions of the sound track, it should have refrained from insisting on their delivery. Defendants are now in no position to challenge the need for the grant or repudiate the dependent conditions and obligations assumed (International News Serv. v. Associated Press, 248 U. S. 215, 240; Outcault v. Bonheur, 120 App. Div. 168).
Since contracts can create rights not otherwise recognized, the resolution of the rights of the parties to this contract, as we have said, did not depend upon property, but upon contract and the relationship of trust and confidence created thereby. Here the authorization to make the sound track was created by contract. Therefore, the right to use the musical portion of the *979 sound track, or any part thereof, is necessarily dependant upon the scope of the contract and the manifest intent of the parties.
Once the contract with Universal is properly construed, the manner of imitation and the medium of copying are distinctions without difference. The use of a copying orchestra rather than electronic dubbing cannot save the defendants because the contract with Universal encompassed the use of a copying orchestra in the making of the musical portion of the sound track. Otherwise, Universal would not have sought to acquire the “compositions, arrangements and orchestrations” owned by plaintiff and ‘ ‘ the right to use or simulate the style * * * of Glenn Miller.” The plaintiff’s right to prevent unauthorized use of the subject matter of her limited grant is totally unaffected by the particular method by which the musical portion of the sound track was created.
The distinction that the duplications of the Miller performance were achieved by a “ studio orchestra ” contemplated by the contract and employed by defendants create a privilege based on imitating must be rejected when part of the means employed by defendant was original, unpublished matter which Universal sought and secured by virtue of the contract by which plaintiff licensed the defendant to make the motion picture.
The lengthy, carefully prepared contract, being most specific in detailing permissible media—photoplay, radio, television, newspapers, fan magazines, trade periodicals, novelizations, serializations, booklets, programs, posters, lobby displays and “ all other media of advertising and publicity including, but not limited to, commercial tie-ups ” — the grant is, by its terms, limited to specific media. It was only by accepting these limitations that Universal was able to obtain the valuable license to make the sound picture. By accepting the contract as written, Universal accepted the obligations imposed by equity on a licensee not to exceed its grants and to refrain from using any of the contract rights in competition with the licensor. (Manners v. Morosco, 252 U. S. 317, 325-326; Harper Bros. v. Klaw, 232 F. 609, 612; Klein v. Beach, 239 F. 108; Ettore v. Philco Television Broadcasting Corp., 229 F. 2d 481, 487, cert. denied 351 U. S. 926; Herne v. Liebler, 73 App. Div. 194, 200.)
In aE these cases the question decided was whether the words of the contracts embraced the additional media. None of them turned on the status of the licensor.
*980 As this court held in Kirke La Shelle Corp. v. Armstrong Co. (263 N. Y. 79, 87-88, supra) in following the Manners and Harper Bros, decisions (supra), “ Respondents seek to distinguish those cases on the ground that the courts were not construing a contract, but dealing with a question of whether one without authority could appropriate an essential part of copyright. Those cases were decided not on copyright law, but on the law of contracts ’ ’. The principles applied in the Manners and Harper Bros, decisions {supra) were held by this court (p. 87) to be, in the last analysis, an application of the “ principle that in every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing.”
It was manifest to all at the time of the contract that the plaintiff would be substantially benefited by reason of the contract in the way of increased income from royalties on the increased sale of the Miller RCA records which would follow the release of “ The Glenn Miller Story” and the renewal of interest in the Glenn Miller style of music which would be engendered by its exhibition. While the limitation of the grant was respected, that expectation was being fully fulfilled until interrupted by defendants’ poaching. One can hardly imagine a more palpable intermeddling with the fruits of a contract.
Defendants admit, and it is apparent, that “ Decea’s primary interest in releasing the records * * * was to make a profit ”. Such a use by defendants exceeded the limits of the grant which restricted the use of the sound track to the photo-play, the television, radio, and the promotion of the motion picture. The enforcement of the obligation not to exceed the scope of the grant is based on contract because the use of the sound track from the picture by defendants diverted profits which defendant knew would accrue and were accruing to plaintiff’s interests in the phonograph record business and constituted a breach of Universal’s obligation as a party to the contract to conduct itself faithfully. (See Margolis v. National Bellas Hess Co., 139 Misc. 738, affd. 235 App. Div. 839; Montegut v. Hickson, Inc., 178 App. Div. 94.)
In this case, relief does not depend necessarily upon the implication by the court of a “ negative covenant ” on the part of the licensee. As respondent notes, “ the specificity of the *981 licensed use is the limit of permissible uses and implies prohibition of non-licensed uses.” The Manners case holds that where the grant is by its terms limited to specific media equity will grant relief as against the licensee who exceeds the limits of the grant. The omission of an express negative covenant from the contract cannot be interpreted as an implied recognition of Universal’s right to use the sound track for phonograph recordings. It was unnecessary to express such a prohibition since the contract shows that the only uses of the sound track contemplated were motion pictures, radio and television; and both parties knew of plaintiff’s exclusive contract with RCA for the licensing of records.
It is plain that plaintiff, as the exclusive licensor of the original Glenn Miller Orchestra recordings, has sufficient interest to halt the use of the sound track for recordings by Universal and its parent, Decca, where such use constitutes a breach of contractual duty owed to the plaintiff. An unauthorized interference with the licensor’s exclusive right to profit from a licensing agreement to make recordings is actionable apart from the rights of the licensee (Metropolitan Opera Assn. v. Wagner-Nichols Recorder Corp., 199 Misc. 786, affd. 279 App. Div. 632; Capital Records v. Mercury Records Corp., 221 F. 2d 657 [2d Cir.]).
The respondents ’ contention that plaintiff has no right to sue because RCA has the exclusive license to make phonograph recordings of performances of Glenn Miller and his orchestra is untenable. The holding in the Metropolitan Opera case {supra) that Metropolitan, which had sold the broadcasting rights and the right to make and sell phonograph records, had, apart from legally recognized property rights, or contract rights, standing to sue is applicable here. (See, also, Gieseking v. Urania Records, 17 Misc 2d 1034; Pittsburgh Athletic Co. v. KQV Rroadcasting Co., 24 F. Supp. 490.)
As the decisions make plain, the plaintiff’s standing to sue and recover is not to be determined by an inquiry as to whether plaintiff possessed a legally recognized property right, but whether plaintiff had rights which defendants interfered with by a scheme which violated the contract defendant Universal made with plaintiff.
The fact that the resulting unauthorized competition effectively diverted profits away from the plaintiff which should have gone to the plaintiff is enough. Protection of the Miller *982 recordings as between plaintiff and Universal is not limited to protection against reproduction by purely mechanical means. The courts obviously do not intervene only on the ground of mechanical reproduction. Mechanical reproduction may not be involved at all (e.g., Fisher v. Star Co., 231 N. Y. 414; Dior v. Milton, 9 Misc 2d 425).
Since the unauthorized use of the musical part of the sound track tends to saturate the market in which plaintiff has a substantial pecuniary interest, and thus diminishes and possibly destroys the value of plaintiff’s stake in the record field by means of a violation of the contract Universal agreed to, the plaintiff is entitled to a perpetual injunction and an accounting.
Accordingly, the judgment of Special and Trial Term should be reinstated.
Judgment affirmed, etc.