**SWANSON MFG. CO. et al.. v. FEINBERG-HENRY MFG. CO., Inc., et al.**

District Court, S. D. New York.

July 12, 1943.

Munn, Liddy & Glaccum, of New York City (John H. Glaccum, of New York City, of counsel), for plaintiffs.

George M. Glassgold, of New York City (Irving F. Goodfriend, of New York City, of counsel), for defendant Feinberg-Henry Mfg. Co., Inc.

Jacob B. Goldberg, of New York City, for defendants Columbia Mfg. Co. and E. Behrman & Co.

LEIBELL, District Judge.

On April 25, 1938, plaintiff, Nels H. Swanson of Chicago, Illinois, filed an application for a patent on a coin purse. The following paragraphs of the specifications describe the purposes of the alleged invention:

"The present invention relates to coin purses and more particularly to a 'zipper' type of casing having bill, coin, and card pockets provided therein, with one of the pockets provided with an extension to which the lower bevelled end of a coin holder, of a molded plastic product, is secured and formed with suitable coin slots and with inclined top faces to expose coin rest surfaces and guides to facilitate convenient insertion of coins and the easy extraction of the same past suitable detent members provided in the coin slots.

\*    \*    \*    \*    \*

"It is an important object of this invention to provide an improved type of coin case of a middle hinge type provided with a marginal zipper closure mechanism for enlosing a slotted coin holder, the lower end of which is hingedly supported within the casing, with said coin holder being preferably constructed of a molded plastic such as a cellulose acetate product, permitting the partitions separating the coin slots to be suitably bevelled or inclined for the convenient inserting of coins and the removal of coins from the slots which are open both at the front and the back of the coin holder to serve as finger guides for the movement of coins past detents or retaining clips provided near the outer ends of the coin slots to obviate the accidental sliding of coins out of the slots, but permitting the movement of coins past the same when the coins are manually moved."

The patent, as issued January 2, 1940 (No. 2,185,359), contained six claims, of

which the 4th, 5th and 6th are involved in this suit. They read as follows:

"4. A coin purse comprising a pair of cover sections having a hinge connection there between, a pocket secured on the inner side of one of the cover sections, a hinge extension integrally formed on the bottom of the pocket, a coin holder having an inclined bottom secured to the hinge extension to permit pivotal swinging of the coin holder with respect to said cover sections, said coin holder having a plurality of coin pockets of different sizes provided therein having inclined bottoms and separated by resilient grooved partitions for receiving therebetween small coins of different denominations and sizes, and stop members in the grooved partitions for governing the insertion and removal of coins from the coin holder.

"5. A purse comprising a pair of cover sections connected together by a hinge section disposed between them, a member secured to one of said cover sections to define a pocket therewith having a closed end adjacent the hinge section and said member extending beyond said closed end to define a hinge member, a coin holder comprising a substantially rigid member having an inclined lower portion attached to said hinge member for swinging movement between said cover sections.

"6. A coin purse comprising a cover section, a combination pocket and hinge member in the purse, and a coin holder secured to the hinge member to permit the coin holder to swing into different positions with respect to the cover section, said coin holder comprising a coin receiving member having an inclined bottom surface secured to the hinge member, said coin receiving member also having a plurality of coin receiving pockets formed with inclined bottoms and with side coin guide grooves having coin stops therein adapted to be flexed by the insertion of coins into the pockets and by the removal of coins from said pockets."

Plaintiff, Swanson Mfg. Co. (of which Nels H. Swanson is president), is the exclusive licensee under said letters patent and since August, 1938, has manufactured a coin purse with a plastic coin rack, which has been a success commercially. The coin rack bears plaintiff's trade-mark "Jiffy".

Defendant, Feinberg-Henry Mfg. Co., is a New York corporation with a place of business in this District. It began manu-

facturing coin racks of a plastic substance in the Fall of 1939, on which it impressed its trade-mark "Mayflower". The molds for the coin racks were ordered in May, 1939. Feinberg-Henry Co. has sold its "Mayflower" plastic coin racks to the defendants, Columbia Mfg. Co. and E. Behrman & Co., who attach them inside coin purses of a conventional type, which they sell to retailers. Feinberg-Henry also manufactures coin purses and uses its "Mayflower" plastic coin racks as a part thereof. Their cheapest type purse, known as Mon-E-Pak, is sold to chain stores. Others of a better type are sold to retailers generally.

Plaintiffs plead two claims (causes of action) in their amended complaint, one for patent infringement and the other for unfair competition. This court has jurisdiction to determine the issues in each case.

### The Patent.

■ The claim for patent infringement alleges that the plastic coin racks manufactured by Feinberg-Henry and used in the purses of Feinberg-Henry, Columbia and E. Behrman & Co. infringe claims 4, 5 and 6 of the patent in suit. To this the defendants answer that plaintiffs' coin rack lacks invention, that all its essential functional elements are found in the prior art, and that at best it is an unpatentable aggregation of old elements. I have concluded that claims 4, 5 and 6 of plaintiff's patent are invalid, that they lack invention, that their principal elements were disclosed by the prior art. But if said claims of the patent had been valid, the defendants would have infringed through the manufacture and sale of purses containing the "Mayflower" plastic coin rack made by defendant Feinberg-Henry.

Although plaintiff, Nels Swanson, disclosed the appropriateness of using a plastic material (it was light, resilient, and could be molded in one piece) in the specifications of his patent, the patent claims as allowed do not cover the use of a plastic material in the manufacture of the coin racks. Unquestionably the plaintiffs were the first to manufacture plastic coin racks for use in coin purses. The defendants got their idea of a plastic coin rack from the commercial success of plaintiffs' coin rack.

In findings of fact filed herewith I have specified the patents of the prior art which contain elements of plaintiff's patent, either alone or in various combinations. The

idea of a coin rack with grooves of various sizes to hold coins of different denominations in their respective grooves, according to size, is old. The use of an inclined base or other device for tilting coins in a groove and holding them in a position where they partially overlap and can be easily removed, is also old. Likewise the use of some restraining force on the sides of the grooves to keep the coins from falling out, and the use of a nub or slight bulge inwardly at the entrance end of the groove, to detain the coin, were known in the prior art and served as a coin stop or coin detent. In fact, plaintiff, Nels Swanson, had for many years (since 1928) manufactured a metal coin rack in which a slight bulge at the upper end of the grooves acted as a coin detent. He applied for a patent on the metal coin rack but never carried the proceeding through to the actual issuance of a patent. Plaintiffs were still making the metal coin rack in 1942.

The principal difference in construction between the plastic coin rack manufactured by plaintiff under the patent in suit and the metal coin rack plaintiff has made for many years, are the light resilient material of the plastic and the inclined bottom for tilting the coins in the groove, so that they overlap in part and are quite readily removed.

The plastic material has properties which make it more adaptable than metal in the manufacture of coin racks for use in leather purses. The plastic coin rack can be poured and molded as one piece: there are a dozen separate pieces in the metal rack. The natural resiliency of the plastic helps hold the coins in place and makes it easier to extract coins from the grooves. The plastic weighs less than the metal. The purse itself is easier to carry and should wear longer, because there is less of a weight strain on the leather hinge and less friction on the lining of the purse.

Plastics in recent years have in many ways supplanted metal, especially the heavier metals, in the manufacture of devices of all kinds. Plaintiff by being the first to use plastic in manufacturing a coin rack could not thereby gain a monopoly which he was not given by the claims of the patent. Further, the use of a plastic material instead of metal could not, in the case of a coin rack, be classed as invention, even if the allowed claims had specifically covered a plastic, which they do not.

In claim 5 reference is made to the manner in which the coin rack is attached to the purse. It provides that some of the purse material (leather) at the bottom of a side pocket, should be extended (as a flap) so as to form a hinge member, to which the coin holder may be attached and swing freely between the cover sections. There was nothing new in having a hinge attachment, at the folding line of a purse, to which a leather receptacle (for identification cards or automobile licenses) could be attached. The prior art disclosed it in many different forms.

When claims 4, 5 and 6 of plaintiff's patent are read, upon the disclosures of the patent, they cover "nothing but the use of the old combined in obvious ways". As Judge Chase wrote in General Time Instruments Corporation v. New Haven Clock Company, 2 Cir., 136 F.2d 49, 50: "Though it is often hard to determine when invention begins, we think it is clear that the present standard for patent claim validity is too high to include this sort of thing. * * * In any event, there is nothing in the patent to bring it up to the plane of inventive thought required by Cuno Engineering Corp. v. Automatic Devices Corp., 314 U.S. 84, 62 S.Ct. 37, 86 L.Ed. 58."

### The Unfair Competition.

Plaintiffs' second claim (cause of action) is for unfair competition. Plaintiffs allege that Swanson Mfg. Co. and its predecessor in title have for many years been engaged in the manufacture and sale of coin purses and have established in the public mind a reputation for the quality, durability and value of their purses; that in August, 1928, the corporate plaintiff's predecessor adopted and began to use the trade mark "Jiffy" in order to distinguish its coin purses from those of other manufacturers on the market, and extensively advertised under the trade mark both to the trade and to the purchasing public, at great expense. The above allegations were established in part only.

The amended complaint also alleged that the coin purses manufactured under plaintiffs' letters patent have become so associated with the plaintiff in the public mind as to have acquired such a secondary meaning that any coin purses of the same appearance would be ascribed to the plain-

tiff as the source of production. This allegation has not been proven either directly or inferentially.

█ The proof in respect to plaintiff's sales and advertising, in the period between August, 1938, when it first made the "Jiffy" plastic coin rack and October, 1939, when defendant, Feinberg-Henry, put its "Mayflower" plastic coin rack on the market, is not such as to justify the conclusion that a purse with a plastic coin rack had "become so well associated with the plaintiff" (or plaintiffs' trade mark "Jiffy") "as to acquire a secondary meaning" and "cause any [purse] of the same appearance" having a plastic coin rack "to be ascribed to the plaintiff as the source of production." See, Lewis v. Vendome Bags, 2 Cir., 108 F.2d 16, 18. The fact is that plaintiff's predecessor had used the trade mark "Jiffy" on a coin purse with a metal coin rack, which plaintiff had sold as far back as 1928. Plaintiff continued to make metal coin racks until 1942. Plaintiff's advertising undoubtedly informed jobbers, wholesales and retailers in the period between August, 1938, and October, 1939, that plaintiff's "Jiffy" purse with a plastic coin rack was on the market, but neither the sales to the purchasing public nor the advertising so directed were of such volume as to have created a public impression that coin purses with plastic coin racks had only the plaintiff as their source. Plaintiff spent about $2,500 in 1938 in advertising these "Jiffy" plastic coin rack purses, and about $5,800 in 1939. Plaintiff's sales of these "Jiffy" purses for 1938 amounted to about $8,000 and in 1939 to about $67,000. In the latter part of 1939 defendant Feinberg-Henry Mfg. Co. entered the field with its "Mayflower" plastic coin rack, and coin rack purses. In June, 1940, the defendant Columbia Mfg. Co. began manufacturing purses containing "Mayflower" plastic coin racks. There was not enough time nor a broad enough market in the period between August, 1938, and October, 1939, for plaintiff to have built up in the public mind the impression that all plastic coin rack purses had the plaintiff as their source.

It is also alleged in the amended complaint that "each of the defendants has made or sold infringing coin purses of the identical appearance and as precise copies and substantial counterfeits of the said coin purses of the plaintiff, with the intent and the result of profiting by the inevitable public confusion created by defendants' said substantial counterfeits".

At an examination of Mr. Swanson before trial on this issue, plaintiff's attorney stipulated (in lieu of a bill of particulars): "* * * that the combination of the following elements produce a design which it is alleged has been so advertised to be recognized by the public as the 'Jiffy' purse manufactured by the plaintiff corporation. These include general size and shape of the purse, plurality of pockets arranged to receive bills or other articles, one of which pockets is extended to form a hinge on which is mounted a distinctively shaped coin rack which is made so that it will lie flat within the purse and so that the coins will be positioned in the racks at an angle. And also included among the elements are the closure means used comprising a snap fastener or a zipper arrangement. The color scheme is an additional element, as well as the leather used."

The general size and shape of plaintiff's purse (not uncommon) were determined by two things—the functional purposes and the manner in which the purse would be carried. One of the main purposes of the purse was to contain a coin rack for small change. In this country the coin racks in use were designed to carry in separate grooves coins of four denominations, quarters, dimes, nickels and cents. The space necessary for these four grooves would be determined by the size of the coins and the uprights forming the grooves. The size of the coins is fixed by the Government; the width of the above uprights would be determined by the strength required and the resiliency of the material used. The capacity of the coin rack would be governed by the average shopper's need for change. This would not call for a large rack. If the same material (a plastic) is used by the manufacturers of coin racks, and each, for the sake of economy in space and cost, uses a minimum of plastic material, the uprights of the grooves of the coin racks would be about the same size. No one could properly claim a monopoly for a bill fold just large enough to hold government paper currency, or having a pocket therein just the right size for stamps. The use for which a purse is designed determines in a great measure what its size will be.

Plaintiff advertise that its purse fits the hand—or hand bag. Such a purse, of course, would be small. A wallet opening like the covers of a book and intended to be carried in the inside pocket of a man's coat or blouse would be made to fit the

size of the pocket. A bill fold to be carried in the trouser's pocket would be smaller than a wallet. The thickness of the bill fold purse would depend upon the number of its compartments and whether or not it had a key rack or a coin rack. The number of compartments and gadgets would be governed in part by the price at which the purse would be sold. As a result, purses of many different sizes and shapes are manufactured for the trade. A woman's handbag is usually of such a generous size, that a purse small enough to fit into a man's pocket, could easily be stowed therein. As one of plaintiffs' advertisements put it—the coin purses were "designed for men" and "acclaimed by women". They were manufactured "in masculine tones for men" and in "costume colors for women".

Many of defendants' purses were of the same size as plaintiffs' and they all had a plurality of pockets arranged to receive bills or other articles. Purses have been so constructed for many years, as we all know. I do not believe that a purchaser would assume that a purse was plaintiffs' product, because it was of a conventional size or shape or had a plurality of pockets. Whatever good-will there might be in that, is common property. The trade mark did not cover it—nor did the patent.

It may be that the size of the purse is as much functional as the pillow-shape was in the "Shredded Wheat" case. Kellogg Co. v. National Biscuit Co., 305 U. S. 111 at page 122, 59 S.Ct. 109, 83 L.Ed. 73. The cost of the purse would be increased if defendants were required to make theirs larger. It could not be made smaller and yet hold the coin rack. Since the coin rack may be manufactured by all (its patent is invalid), plaintiff could not assert exclusive rights in the form "in which the public had become accustomed to see the article". Defendants in turn were free to use that form of coin rack and purse but there rested upon them the duty to identify their product lest it be mistaken for plaintiffs' and to use means which would reasonably distinguish defendant's product from that of plaintiff. Kellogg Co. v. National Biscuit Co., supra.

"In the absence of some recognized right at common law, or under the statutes —and the plaintiff claims neither—a man's property is limited to the chattels which embody his invention. Others may imitate these at their pleasure. * * *

This is confirmed by the doctrine of 'non-functional' features, under which it is held that to imitate these is to impute to the copy the same authorship as the original. * * * These decisions imply that, except as to these elements, any one may copy the original at will." Cheney Bros. v. Doris Silk Corporation, 2 Cir., 35 F.2d 279, 280. See, also J. C. Penney Co. v. H. D. Lee Mercantile Co., 8 Cir., 120 F.2d 949, for a discussion of the term "functional".

"There is nothing unlawful in copying the unpatented products of another dealer down to the last detail, except in so far as the resulting similarity may become a means of securing his customers through their belief, so induced, that your goods are his." Electric Auto-Lite Co. v. P. & D. Mfg. Co., 2 Cir., 109 F.2d 566, 567.

We have all come to know the bill fold, with a hinged leather framed compartment in which an identification card or license may be carried. To have a coin rack similarly hinged lying flat within the purse, when coin racks became popular, was a natural development in the art. No one, by being the first to do it, could bar others from doing the same thing. And if he closed the purse with a zipper arrangement or a snap fastener, others could also use the same common means of holding the sides of the purse together. A snap fastener for a purse is older than any of the litigants and zippers have been in use for closure purposes on all sorts of leather goods, bags and brief cases for many years. Indeed, defendant Feinberg-Henry advertised in 1938 a purse with a zipper fastener.

Coin rack purses have been made by plaintiff and defendants in many varied colors and in leather of different types. Plaintiff did not limit itself to one or several special colors or types of leather. Plaintiff's purses, marked as exhibits at the trial, were in almost every color and type of leather purchasable on the market and adaptable to the manufacture of purses. Defendants' purses also embraced a similarly wide range. The luggage shops, at different seasons, feature certain leathers and colors. Plaintiffs do not claim that they had any special leather manufactured in a design and color for their coin rack purses.

This brings us to the remaining element which plaintiffs contend served the purpose of producing a design which the public would recognize as the plaintiff's "Jiffy"

purse. I refer to what plaintiffs term "a distinctively shaped coin rack which is made so that it will lie flat within the purse and so that the coins will be positioned in the racks at an angle". All this was the subject of the patent claims which I have held invalid for lack of invention. Should plaintiffs nevertheless be given, on a claim of unfair competition, the same monopoly which they sought under the patent statute? Defendants have copied only so much of plaintiff's coin rack as comprise its functional features and assert that they took proper precautions to distinguish their coin rack from the plaintiffs. These identifying measures were—the trade mark "Mayflower" impressed on the plastic coin rack; trade names and special designs stamped on the purse itself; advertising matter inserted in the purse.

The amended complaint alleges that the defendant Feinberg-Henry manufactures the "coin purses herein complained of", that Columbia Manufacturing Co. and E. Behrman & Co. act as jobbers and distributors, that the Hoffritz stores distribute and sell the coin purses to the purchasing public and "have advertised, sold and passed off the coin purses herein complained of, as plaintiff's coin purses". It is further alleged that the defendants Columbia and Behrman "have offered for sale and sold, and are offering for sale and selling, the infringing coin purses as and for plaintiff's 'Jiffy' coin purses, and have filled orders from retailers specifically calling for the plaintiff's 'Jiffy' coin purses with the infringing counterfeit of plaintiff's 'Jiffy' coin purses". The defendants are alleged to have been fully aware "of plaintiffs' rights in the premises".

Paragraph 26 of the amended complaint states: "26. All of the aforementioned acts of the defendants are in violation of plaintiffs' rights under United States Letters Patent No. 2,185,359 and constitute acts of unfair competition with corporate plaintiff, which, by deception of the purchasing public, have damaged plaintiffs' business, goodwill and reputation, and which, unless restrained by this Honorable Court, will irreparably damage plaintiff's business and goodwill."

The prayer for relief is as follows: "Wherefore, plaintiffs demand a temporary restraining order and a preliminary and final injunction against further infringement by the defendants, and those controlled by defendants, of said letters patent, and against further unfair competition in respect to coin purses infringing upon said letters patent, and also an accounting for profits and damages, and an assessment of costs against the defendants."

Plaintiffs' plastic racks were put on the market in August, 1938. They were advertised in some magazines, for the purchasing public. Defendant Feinberg-Henry did not complete its blue prints for its plastic molds until May, 1939. It began the manufacture and sale of plastic coin racks in the Fall of 1939. The inference is warranted from the evidence that the plastic coin racks of plaintiff had come to the attention of Feinberg-Henry some time prior or thereto and that Feinberg-Henry decided to make plastic coin racks when it learned of plaintiff's product.

The plaintiff did not put any distinguishing mark on the outside of its coin rack purses. It did place its trade mark "Jiffy" on one of the uprights of the coin rack, inside the purse. Otherwise there was no distinguishing mark on the inside or outside of plaintiff's purses. Later plaintiff inserted in the bill pocket of some of its purses a printed slip containing "Directions for using the Jiffy". The directions referred to the "Jiffy" plastic purse and appeared below illustrations of "Jiffy" purses and a "Jiffy" wallet. At the end of the directions there was the notation "Copyrighted 1940 by Swanson Mfg. Co."

There was very little direct proof of confusion in the mind of the purchasing public. In a few instances a defective coin rack, not of plaintiff's manufacture, was returned to plaintiff for credit or repair. In another instance, where entrapment was resorted to, an order sent to the Columbia Manufacturing Co. for "Jiffy" coin purses was filled by the shipment of a dozen Scotch coin purses with Columbia's trade-mark (Wales) on the purses and with Feinberg-Henry's trade-mark (Mayflower) on the coin rack. Some retail stores operated by defendant Hoffritz sold a customer defendants' purses when she asked for "Jiffy" purses. Hoffritz displayed both kinds in their show window and in a counter case placed near a card advertising "Jiffy" purses. A defendant manufacturer is "not responsible for substitutions made by unscrupulous" retailers, if defendant "does nothing to further their practices." Electric Auto-Lite Co. v. P. & D. Mfg. Co., 2 Cir., 109 F.2d 566.

The defendant, Feinberg-Henry Mfg. Co., Inc., is a New York corporation with a place of business in New York County. The defendant, Columbia Manufacturing Co., is a co-partnership having a place of business in New York County. The acts of these defendants which constituted unfair competition with plaintiff, Swanson Mfg. Co., were at least initiated in this State and in some instances were completely performed here. Whether or not their conduct was tortious is a question of state law, under Erie R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L. Ed. 1188, 114 A.L.R. 1487. See, Fashion Originators Guild v. Trade Commission, 312 U.S. 457, at page 468, 668, 61 S.Ct. 703, 85 L.Ed. 949.

The applicable legal principles under New York law are summed up and clearly stated in an excellent opinion by Mr. Justice Davis, Supreme Court, Madison County, N. Y., in Oneida, Ltd. v. National Silver Co., 25 N.Y.S.2d 271, pages 275, 276 from which I quote the following:

"The question of whether equitable relief will be granted or withheld, depends upon the facts developed in the particular case, which accounts for the variances in results in adjudicated cases. The courts will inquire beyond the adroitness used in simulation, and disregard minor differences, for the test of offensive simulation is in general resemblance, not incidental differentiation. Unfair competition is a species of fraud, where fraudulent intent is a necessary ingredient. The test is whether the simulation or other acts result in the deception, or the likelihood thereof, practiced on the inexperienced public, the casual or ordinary purchaser of goods, or of confusion in the public mind concerning the source of the competing product. In certain cases the court will take the ensemble which the competing party has made up for the public display of their goods, and compare it with that of the original vendor. The essence of unfair competition is to be found in cases where the simulated article is 'palmed off' or 'passed off' as the goods of another, involving, of course, the intent to deceive. This consists not only in the sale of the original vendor to dealers or retailers, but also the acts of these latter persons in actual or attempted substitution. The rule is that he who induces another to commit a fraud and furnishes the means, is equally guilty with the one who perpetrates the fraud. The fact that dealers who have become familiar with both articles and can readily distinguish the difference is not important. Courts will not tolerate a deception devised to delude the consuming purchaser by simulating some well-known product. It is not necessary * * * that any particular person has been actually deceived; it is the opportunity afforded for deception and the likelihood of confusion or deception which the courts take into consideration. The controlling question in all cases where the equity power of the courts is invoked is whether the acts are fair or unfair, according to principles recognized in equity, and not by 'The morals of the market place.'"

### Feinberg-Henry Mfg. Co., Inc.

The sale of the accused coin purses to the trade by the manufacturing defendants did not constitute unfair competition in so far as they used proper means to identify their product "lest it be mistaken for that of the plaintiff." Kellogg Co. v. National Biscuit Co., supra [305 U.S. 111, 59 S.Ct. 114, 83 L.Ed. 73]. In most instances that was done. The coin racks manufactured by defendant Feinberg-Henry and sold by the other defendants all had the trade mark "Mayflower" molded on the front of the rack, with as much prominence as plaintiffs' racks bore the trade mark "Jiffy". Both trade marks appear on the central upright of the coin rack. They are necessarily limited in size and position by the size and functions of the rack itself. The trade mark "Mayflower" was registered by defendant Feinberg-Henry in August, 1939. It does not resemble plaintiff's trade mark. Its spelling and sound are different. There was no proof of any use of the trade mark "Jiffy" by any of the manufacturing defendants. Plaintiff's trade mark "Jiffy" has not been infringed. However "a state of facts may be sufficient to show unfair competition even though insufficient to support a claim of technical trade-mark infringement." Grocers Baking Co. v. Sigler, 6 Cir., 132 F.2d 498, 500, citing cases.

For a time the defendant Feinberg-Henry copied certain advertising material of plaintiff's and used it in the sale of a Feinberg-Henry purse which it termed a "Mon-E-Pak". As to this unfair practice I have made the following findings of fact:

"31. The defendant, Feinberg-Henry Mfg. Co., Inc., deliberately copied plaintiff's illustrations and also certain reading material, including one of plaintiff's ad·

vertising slogans 'New Smart Way to Carry Money', with knowledge of the plaintiff's prior use.

"32. The coin rack illustration and the advertising slogan appearing on the card on which the defendant, Feinberg-Henry Mfg. Co., Inc., mounted and sold its Mon-E-Pak purses were substantially copies of the illustration on the back of plaintiff, Swanson Mfg. Co.'s card, on which its purses were mounted and introduced to the market in April 1939, and of the slogan on the front of said card. The 'Mayflower' Mon-E-Pak card, exemplified by Exhibit 26 contained instructions on the reverse side thereof, the wording of which was a substantial copy of the directions on the reverse side of plaintiff's 'Koin Kaddy' card, Exhibit 27."

While defendant Feinberg-Henry marked all its coin racks with its own trade mark "Mayflower" and on some types of purses had the word "Mayflower" stamped on the leather, yet in the display card to which one of its cheaper purses was attached, it copied the size of the card, the manner of attaching the purse to the card, some of the advertising matter such as plaintiff's slogan, the "New Smart Way to Carry Money"—"for men women and children", and the instructions for use on the back of plaintiff's card. Feinberg-Henry's display card had attached to it defendant's Mon-E-Pak purse so that the purchaser received both the card and the purse. The card was in effect a "container". So was plaintiff's card which Feinberg-Henry copied in part.

Such practices should be enjoined and as to the sales thereby effected I am of the opinion that plaintiff is entitled to an opportunity to prove plaintiff's resulting damage and to an accounting of Feinberg-Henry's profits therefrom.

### Columbia Manufacturing Co.

There were somewhat similar practices on the part of defendant, Columbia Manufacturing Co., in certain instances which are described in findings of fact Nos. 54, 55 and 58, as follows:

"54. Defendant Columbia Manufacturing Co. took one of plaintiff's display cards and copied it in all details, except for the use of the word 'Scotch' in place of the trade mark 'Jiffy', and enclosed said card in its shipment to dealers, at least to the extent of 5,000 cards."

"55. Defendant Columbia Manufacturing Co. likewise used on its boxes and in its advertising the slogan 'A New Way To Carry Money', originated and featured by the plaintiff in its advertising."

"58. Defendant, Columbia Manufacturing Co., filled one order for twelve "Jiffy" purses with purses of its own manufacture, with the trade mark 'Wales' clearly embossed in a suitable place thereon, and billed these twelve purses as Scotch purses on its Company invoice."

These practices will also be enjoined and as to the sales effected by these means plaintiffs are entitled to an accounting and damages.

Defendant Columbia copied in every detail (except one word) a counter display card of plaintiff Swanson Mfg. Co. The only difference was the substitution of Columbia's name "Scotch" in place of plaintiffs' name "Jiffy", in the bottom display line of the card. The defendant's card (Ex. 53) can be superimposed line for line upon plaintiff's card, Exhibit 52. Plaintiff's display cut and advertising slogan "New Way To Carry Money" appear on each. Even the tobacco-brown printer's ink was copied, although not quite the same shade. That all this was deliberately done was admitted by Columbia's president. It must have been done for purposes of deception and together with the similar appearance of the closed coin purse it may be inferred that in many cases deception resulted. This was hardly fulfilling Columbia's obligation that it distinguish its product from plaintiff's. Just the opposite was intended.

On the sides of the large flat box, in which the dozen purses were sent to Roline by Columbia (the entrapment order), there was printed plaintiffs' advertising slogan—"A New Way to Carry Money". A label on one side contained the words "Scotch Coin Purses". A display paper sign enclosed in the box also carried plaintiff's advertising slogan and the words "Scotch purses". The invoice bore the Columbia bill head with references to its trade mark names "Wales" and "Scotch" and the goods were described as "Scotch Purses". A small cardboard holder, for the display of a purse, had printed thereon the words—"The Wales Scotch Purse. A New Way To Carry Money". Each of the dozen purses in this sale to Roline was packed in a small plain box. The coin purses were of different colors and bore no trade mark on the outside—only the words "alligator calf". Each purse was closed with a zipper. When opened, the purse showed a plastic coin rack with the word

"Mayflower" on the central groove finger. In each groove was a round piece of card board, printed like a coin with the names "Wales" thereon. On the lining of the purse there were stamped in gold print the words "Wales Deluxe Scotch Purse". In one of the purse pockets was some stage money bearing a dollar sign and the statement "The Wales' Scotch-Fold. A new way to carry money. Made in all leathers. Guaranteed & Manufactured by Columbia Manufacturing Co., New York City."

Columbia Manufacturing Company has been in business for about twenty-five years, making leather goods, wallets, bill folds, key cases and the like and has registered and used the trade name and mark, "Wales", to identify its products for about nineteen years. It has also used the trade name "Scotch" in the sale of its leather goods and has packaged some of its goods in boxes bearing the name "Scotch Wales Purse", "Wales Scotch Fold", "Scotch Purse" and "Scotch Fold". Its products have been advertised among retailers, who have also been furnished with "mats" for local newspaper advertising.

### E. H. Behrman & Co.

E. H. Behrman & Co. have purchased "Mayflower" coin racks from defendant Feinberg-Henry. The purses made by Behrman Co. included these racks, which bore the "Mayflower" trade mark. There do not appear to have been any other distinguishing marks on the Behrman purses, which resembled plaintiff's purses in size. Behrman Co. did no advertising. No charge of any deliberate attempt to palm off its purses as plaintiffs' is made against Behrman Co. That company no longer manufactures coin rack purses. The evidence connecting them with any invasion of plaintiff's rights by unfair methods of competition is scattered and rather weak. I have directed that the complaint as against Behrman Co. be dismissed, but without costs.

An injunction may properly issue against a defendant who in the sale of a competing product appropriates and uses plaintiff's advertising slogans. The court may also enjoin the use by defendant of plaintiff's printed directions and information for the use of its product. NuEnamel Corp. v. Nate Enamel Co. Inc., 243 App. Div. 292, 276 N.Y.S. 930, affirmed 268 N. Y. 574, 198 N.E. 411.

It is the possibility of passing off defendant's product for that of the plaintiff, rather than the fact itself, that is important. Martin, J.'s dissent in Smith Co. v. American Pharmaceutical Co., 244 App. Div. 702, 278 N.Y.S. 834, reversed 270 N. Y. 184, 200 N.E. 779.

Where a defendant is shown to have pushed the sale of its product at the expense of the plaintiff through unfair practices, which had as their objective to confuse the public mind so that the public would purchase defendant's product thinking it was plaintiffs', we may infer that defendants accomplished the result they intended. When a competitor copies another's carton or advertising matter and both sell the same article, it is reasonable to assume that he intended thereby to acquire some of the other's good will and business. Socony-Vacuum Oil Co. v. Rosen, 6 Cir., 108 F.2d 632, at page 636; J. C. Penney Co. v. H. D. Lee Mercantile Co., 8 Cir., 120 F.2d 949, at page 955; O. & W. Thum Co. v. Dickinson, 6 Cir., 245 F. 609.

If the carton or sales display card are sufficiently alike to mislead the public, it matters not that on the article itself the defendant places some "distinguishing marks by which it could be identified by a careful and discriminating purchaser" because "it is the casual or ordinary purchaser who must be protected, and as to him the test is general appearance." Chesebrough Mfg. Co. v. Old Gold Chemical Co., 6 Cir., 70 F.2d 383, 385.

At the end of the trial I thought that a limited form of injunction would afford plaintiffs adequate relief. But as I have studied the record in Chambers I have come to the conclusion that an injunction would serve only to protect plaintiff Swanson Mfg. Co. from future violations and would not compensate plaintiff for any damages it sustained as a result of defendants' unfair practices. Further, unless accompanied by a decree requiring defendants, Feinberg-Henry Mfg. Co. and Columbia Manufacturing Co., to account for any profits they realized from sales which were accompanied by the unfair practices, those defendants would be permitted to retain the fruits thereof. Socony-Vacuum Oil Co. v. Rosen, 6 Cir., 108 F.2d 632, at page 636.

The following quotations from Michel Cosmetics, Inc. v. Tsirkas, 282 N.Y. 195, 26 N.E.2d 16, 17, are applicable:

"The defendants have wronged the plaintiff. They must pay to the plaintiff the damages they have caused the plaintiff

by that wrong. * * * The wrong inflicted upon the plaintiff is analogous to the wrong suffered by an owner through the infringement of his patent or trademark, and the rule of damages is similar. An infringer must compensate the owner of a trade-mark, a patent, a process or a formula for the profits which the owner would have acquired in his business except for such infringement. * * *

"A wrongdoer who has imitated the containers of the plaintiff and has used the secret formulas and processes belonging to the plaintiff might be compelled 'to yield up his gains to the true owner, upon a principle analogous to that which charges a trustee with the profits acquired by wrongful use of the property of the cestui que trust.' Hamilton-Brown Shoe Co. v. Wolf Bros. & Co., 240 U.S. 251, 259, 36 S.Ct. 269, 270, 60 L.Ed. 629."

See, also, Westcott Chuck Co. v. Oneida Nat. Chuck Co., 199 N.Y. 247, 92 N.E. 639, 139 Am.St.Rep. 907, 20 Ann.Cas. 858.

If only an injunction were granted, with no provision for an accounting by defendants Feinberg-Henry and Columbia, or the ascertainment of plaintiffs' damage, plaintiffs would not be given their day in court. That point was before the New York Court of Appeals in Warren, Inc. v. Turner's Gowns, Ltd., 285 N.Y. 62, 32 N.E.2d 793. The trial court had granted an injunction and directed that plaintiff have judgment for the damages it sustained as well as an accounting of the profits which defendants had made by their wrongful acts of unfair competition. The Appellate Division modified the judgment of the trial court so as to limit plaintiffs' recovery to the injunctive relief granted. On appeal to the New York Court of Appeals the judgment of the Appellate Division was modified so as to reinstate the decision and judgment of the trial court. Judge Conway of the Court of Appeals wrote (pages 67 and 68 of 285 N.Y., page 795 of 32 N.E. 2d):

"The result of 'the modification is that plaintiffs have had no opportunity to establish their damages and defendants' profits either before the trial justice or the referee later appointed. Plaintiffs are clearly entitled to their day in court on those matters. The rule in such a case is well stated in Merriam Co. v. Saalfield, 6 Cir., 198 F. 369, 371: '* * * the usual practice contemplates an accounting and that such practice should be followed, and

an accounting ordered, unless it is made clearly and certainly to appear that neither upon the existing record, nor upon any record which complainant can make before the master, could there be any substantial recovery. If there remains any fair probability that the complainant can produce the necessary proof, or that, upon final hearing, and as aided by all such proof, the trial court or the reviewing court may think that complainant is entitled to a recovery of damages or profits (beyond the amount of any which may be tendered, if a tender is made), then the complainant should have the opportunity to make and present his case.' See, also, Michel Cosmetics, Inc. v. Tsirkas, 282 N. Y. 195, 203, 26 N.E.2d 16; Underhill v. Schenck, 238 N.Y. 7, 17, 18, 143 N.E. 773, 33 A.L.R. 303. * * *

"Inability to prove damages would not preclude plaintiffs from recovering, on an accounting, profits realized from sales unlawfully made, together with interest thereon from the time of the commencement of the action. Cutter v. Gudebrod Brothers Co., 190 N.Y. 252, 83 N.E. 16. Cf. Michel Cosmetics, Inc. v. Tsirkas, 282 N.Y. 195, 199, 26 N.E.2d 16, where there were no profits made by defendant and so only damages were recoverable."

I am filing herewith findings of fact and conclusions of law as required by Federal Rules of Civil Practice, rule 52(a), 28 U. S.C.A. following section 723c. Settle decree on two days' notice.